UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

UNITED STATES OF AMERICA,

                                                                                                        18 Cr. 092 (WFK)

              -against-

PPASSIM ELDER, et al.,

                                                        Defendants.

------------------------------------------------------------------------ x

## DEFENDANT WILBERT BRYANT'S
## POST-TRIAL MOTIONS

                                                      MICHAEL HUESTON, ESQ.
                                                      *Counsel for Defendant Wilbert Bryant*
                                                      16 Court Street, Suite 1800
                                                      Brooklyn, New York 11241
                                                      (718) 246-2900

                                                      EYLAN SCHULMAN, ESQ.
                                                      *Associate Counsel for Defendant Wilbert*
                                                      *Bryant*

Dated: November 1, 2021

## TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................. i

Table of Authorities ............................................................................................. ii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................. 1

ARGUMENT ...................................................................................................... 1

    I. The Evidence Was Insufficient to Sustain
    Mr. Bryant's Convictions ........................................................................... 1

        A.  Counts Two – Bank Fraud and Seven –
        Extortion Conspiracy ........................................................................ 2

            1.  Law of Conspiracy ................................................................... 2

            2.  Count Two ................................................................................ 4

            3.  Count Seven ............................................................................. 5

        B. Counts Eight – Physical Violence in Furtherance of
        Extortion and Nine – Unlawful Use of a Firearm
        in Connection With Extortion ......................................................... 8

        C. Count Ten – Causing Death Through
        Use of a Firearm ............................................................................... 8

            1.  Insufficiency ............................................................................. 8

            2.  Extortion is not a Predicate for Felony Murder ...................... 9

    II. The Court Should Grant Mr. Bryant A New Trial ............................. 13

    III. Mr. Bryant Joins in Elder's Post-Trial Motions ............................... 16

CONCLUSION ................................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Pages**

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) .................................................................................................. 9

*Santana Felix v. Barr*,
    924 F.3d 51 (2d Cir. 2019) ................................................................................. 10

*Schad v. Arizona*,
    501 U.S. 624 (1991) ........................................................................................... 11

*United States v. Amato*,
    15 F.3d 230 (2d Cir.1994) ................................................................................... 2

*United States v. Andujar*,
    49 F.3d 16 (1st Cir. 1995) ................................................................................... 4

*United States v. Bass*,
    404 U.S. 336 (1971) ............................................................................................. 9

*United States v. Canady*,
    126 F.3d 352 (2d Cir. 1997) ................................................................................ 1

*United States v. Chanthadara*,
    230 F.3d 1237 (10th Cir. 2000) ................................................................... 11, 12

*United States v. Chischilly*,
    30 F.3d 1144 (9th Cir.1994) ......................................................................... 9, 12

*United States v. Crowley*,
    318 F.3d 401 (2d Cir. 2003) ................................................................................ 1

*United States v. Ferguson*,
    246 F.3d 129 (2d Cir. 2001) ............................................................................. 13

*United States v. Friedman*,
    300 F.3d 111 (2d Cir. 2002) ............................................................................ 2, 4

*United States v. Jackson*,
    335 F.3d 170 (2d Cir. 2003) ................................................................................ 1

*United States v. Jones*,
    30 F.3d 276 (2d Cir. 1994) .................................................................................. 3

*United States v. Martinez-Sandoval*,
    2003 U.S. Dist. LEXIS 3045 (S.D.N.Y. Mar. 5, 2003) ...................................... 4

*United States v. Miguel,*
　338 F.3d 995 (9th Cir. 2003) .................................................................................9, 12

*United States v. Nusraty,*
　867 F.2d 759 (2d Cir. 1989) ...........................................................................................3

*United States v. Rubin*,
　844 F.2d 979 (2d Cir. 1988) ...........................................................................................2

*United States v. Samaria,*
　239 F.3d 228 (2d Cir. 2001) .......................................................................................2, 3

*United States v. Universal C. I. T. Credit Corp.*,
　344 U.S. 218 ...................................................................................................................9

*United States v. Weiner*,
　152 F. App'x 38 (2d Cir. 2005) ......................................................................................2

*United States v. Wexler*,
　838 F.2d 88 (3d Cir. 1988) .............................................................................................3

*Williams v. United States,*
　458 U.S. 279 (1982) .......................................................................................................9

**STATUTES, RULES, REGULATIONS AND GUIDELINES**

18 U.S.C. § 1111..............................................................................................................9, 10, 11

28 U.S.C. § 1861 ......................................................................................................................14

Fed. R. Crim. P. 29 .....................................................................................................................1

Fed. R. Crim. P. 33 ...................................................................................................................13

Continuing Appropriations for Fiscal Year 1985,
98 P.L. 473, 98 Stat. 1837.........................................................................................................11

Prosecutorial Remedies And Other
Tools To End The Exploitation Of
Children Today Act of 2003,
108 P.L. 21, 117 Stat. 650.........................................................................................................11

**OTHER AUTHORITIES**

Henry S. Noyes, Felony-Murder Doctrine Through the Federal Looking Glass. 69 INDIANA LAW JOURNAL 533 (1994) ..................................................................................10

Nelson E. Roth & Scott E. Sundby, The Felony-Murder Rule: A Doctrine at Constitutional Crossroads, 70 CORNELL L. REV. 446, (1985) .........................................10

## PRELIMINARY STATEMENT

Pursuant to Federal Rule of Criminal Procedure 29, Wilbert Bryant respectfully moves this Honorable Court for a judgment of acquittal with regards to Counts Two, Seven, Eight, Nine, and Ten of the fifth superseding indictment. Bryant also moves, pursuant to Federal Rule of Criminal Procedure Rule 33, for a new trial in the interest of justice.

## STATEMENT OF THE FACTS

Specific facts relevant to particular arguments below will be integrated in this memorandum.

## ARGUMENT

**I.  The Evidence Was Insufficient to Sustain Mr. Bryant's Convictions**

Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); *see also* Fed. R. Crim. P. 29(c)(2). A judgment of acquittal may be granted only if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citations omitted). In deciding a Rule 29 motion, a court must evaluate the evidence in the light most favorable to the government. *United States v. Crowley*, 318 F.3d 401, 407 (2d Cir. 2003). The court must also resolve all issues of credibility in the government's favor. *United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997). Thus, the court is not entitled to second-guess the jury's assessments. *United States v. Rea*, 958 F.2d 1206, 1221-1222 (2d Cir. 1992).

Mr. Bryant was convicted on five counts: Count Two (conspiring to commit bank fraud); Counts Seven and Eight (extortion conspiracy and committing physical violence in furtherance of extortion); and Counts Nine and Ten (using, brandishing, discharging and causing death

through the use of a firearm). The Government presented insufficient evidence to support these counts.

### A. Counts Two – Bank Fraud Conspiracy and Seven – Extortion Conspiracy

#### 1. *Law of Conspiracy*

As the Second Circuit has instructed, "the fundamental element of a conspiracy is unlawful agreement." *United States v. Rubin*, 844 F.2d 979, 983 (2d Cir. 1988). To establish the existence of a conspiracy, the Government is required to prove the existence of a "meeting of the minds" among the purported conspirators, as to at least the general nature of the plan, if not every detail of its execution. *United States v. Weiner*, 152 F. App'x 38, 40 (2d Cir. 2005). The Government need not present evidence of a formal or express agreement, but it must, at a minimum, prove that the conspirators shared "a tacit understanding to engage in the offense." *See United States v. Amato,* 15 F.3d 230, 235 (2d Cir.1994).

Accordingly, even when a defendant has associated himself with persons proven to be conspirators, and even if he has demonstrated through conduct his suspicion that criminal activity of some kind is afoot, the Government must prove that he knew the specific unlawful aim of the conspiracy, and that he acted intentionally to achieve that unlawful objective. *United States v. Samaria*, 239 F.3d 228, 233-34 (2d Cir. 2001); *United States v. Friedman*, 300 F.3d 111, 124 (2d Cir. 2002) ("[p]roof that the defendant knew that *some* crime would be committed is not enough") (emphasis in original).

Indeed, as the Court stated in *Samaria*, permitting a guilty verdict without proof of a defendant's knowledge of the conspiracy's illegal objective, and his specific intent to join the conspiracy in furtherance of that objective, "would be to permit suspicious circumstances or

association with criminals to suffice as proof of conspiracy." *Samaria,* at 240.  *See also United States v. Wexler*, 838 F.2d 88, 91-92 (3d Cir. 1988).

The *Samaria* Court also reaffirmed the principle that "mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, *even if the defendant has knowledge of the conspiracy.*" *Samaria,* at 235, *citing United States v. Jones*, 30 F.3d 276, 282 (2d Cir. 1994) (emphasis added) (other citations omitted).

A defendant's knowledge and participation in a conspiracy with the requisite criminal intent may be demonstrated by circumstantial evidence.  *See, e.g., United States v. Villegas,* 899 F.2d 1324, 1338-39 (2d Cir.1990).  However, there must "be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Nusraty,* 867 F.2d 759, 763 (2d Cir. 1989) (citations and internal quotation marks omitted); *United States v. Rodriguez,* 392 F.3d 539, 545 (2d Cir. 2004); *United States v. Samaria*, 239 F.3d at 233-34.

As the Second Circuit summarized in *Rodriguez,* "the conspiracy and substantive charges, both of which are specific intent crimes, required the government to establish that Rodriguez knowingly and intentionally participated in the [charged] drug deal[.]" *United States v. Rodriguez*, 392 F.3d at 545 (citations omitted).  In fact, the Court characterized the defendant's knowledge of the precise crime to be undertaken, and the concurrent specific intent to commit it, as triggering "the critical question []: whether the government proved beyond a reasonable doubt that Rodriguez had the knowledge and specific intent to aid and abet a *drug* transaction." *Id.* at 546 (emphasis in original).

3

Consequently, "where the Government seeks to prove a fact that is also an element of the offense by circumstantial evidence … the inferences [must be] sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Friedman*, 300 F.3d at 124.  Accordingly, despite the fact that membership in a conspiracy can be proven through circumstantial evidence, the evidence is nevertheless insufficient to sustain a conviction when "the circumstantial evidence regarding Defendant's specific intent to join the conspiracy equally supports competing theories of guilt and innocence."  *United States v. Martinez-Sandoval*, 2003 U.S. Dist. LEXIS 3045, at *21 (S.D.N.Y. Mar. 5, 2003); *see also United States v. Andujar*, 49 F.3d 16, 22 (1st Cir. 1995) (reversing drug conspiracy conviction because evidence "offer[ed] equal support to both [the defendant's] mere presence theory, and the prosecution's theory that [the defendant] was knowingly acting as a facilitator and go-between in the conspiracy[,]" because "[w]hen a jury is confronted . . . with equally persuasive theories of guilt and innocence it cannot rationally find guilt beyond a reasonable doubt") (footnote omitted).

    2. *Count Two*

Though the Government had TD Bank employee, Joanie Galestro, testify, *see* Trial Transcript ("Tr.") at 835-857, and submitted Mr. Bryant's TD Bank records GXs 209A, 209B, 209C, 209D in evidence, Tr. at 647, there was still insufficient evidence for a jury to find that Mr. Bryant conspired to engage in a bank fraud with co-defendant Ppassim Elder in July and August of 2012.  This is because the alleged victim, Thomas Hardy, did not testify that he was ever victimized.  Indeed, besides providing Mr. Hardy's address and bank details reflecting that Mr. Hardy wired $32,000 into an account associated with Mr. Bryant, Tr. at 850, 851, the jury was provided with no other information about Mr. Hardy, including why he wired the proceeds,

or that the wire was caused by false or fraudulent pretenses, representations or promises, deception, scheme, or artifice.

Furthermore, the Government did not show that Elder was the beneficial owner of Mr. Bryant's TD account, or that Elder received any portion of the funds wired by Hardy. And while cooperator Frederick McCoy testified that he "put [Mr. Bryant and Elder] together" to commit bank fraud and that Mr. Bryant gave him "$1,000" as a "finder's fee," he testified that he did not know which bank account was used. Tr. at 347, 348.

   3. *Count Seven*

There is insufficient evidence that Mr. Bryant conspired to wrongfully obtain or take the personal property of another, or from the presence of another. This is because the relationship between Elder and the alleged victim, Mahmoud Kasem, was never sufficiently explained by the Government; and Mahmoud Kasem's conduct shows that there was no personal property that was the object of the conspiracy.

First, the evidence of who owned Garden Valley Distributors was murky. Delivery driver, Rolando Mojica, testified that on paper it was Mohammed Kasem (Mahmoud Kasem's brother) who was the owner of Garden Valley Distributors. Tr. at 265, 266. But Mahmoud Kasem had unfettered access to the business bank account, and then shared the account information with Elder. Tr. at 101-104 (A. "[Elder] deposited -- it was deposited into that account and it was wired like he said.").

Second, the evidence showed that Garden Valley Distributors brought in tens of thousands weekly, sometimes in cash, as Clerk Anjane Ramnath testified:

5

> Q Uh-huh. Well, let's say like one day, what would be the gross income?
> A It would be a range from 5,000 to 20,000.
>
> Q A day?
> A Yes.
>
> Q So that would be how much per week?
> A Sometimes there will be about 50, 60, 70,000 weekly.
>
> Q And do you handle the checks and the cash?
> A Sometimes.

Tr. at 288. This testimony contradicted Mahmoud Kasem's supposed reason for needing funds from Elder to expand the business after his request for a bank loan fell through. Tr. at 84 ("Q What, if any, steps did you take to try to expand the business? A I had went to the bank and tried for a loan. Q Was that successful? A It didn't work out. Q Why not? A Because we needed more -- we needed more paperwork, we needed more stuff that I was -- the company wasn't ready for that."). This brought into question Mahmoud Kasem's relationship with Elder.

The evidence showed that Mahmoud Kasem's conduct, involving Elder, was not only unusual, but did not involve a loan, and was likely illegal. Kasem testified that he agreed to cash "[t]hree to four checks" for Elder valued at approximately $73,000 in his TD Bank account. Tr. at 92, 93, 94 ("A After deposit I waited for the checks to be cleared and he would call me. Q What would he say to you in those calls? A He would tell me that the check went through, I say yes, it went through. He would ask me and I answer and he would ask me to pull out to money from it."). And after Kasem withdrew the money from his account he gave a portion to Elder and kept the rest for himself. Tr. at 94-96 (Q Mr. Kasem, from the total amount of money that you withdrew with these checks, was all of it withdrawn or was some left over in the bank? A

6

Some left over. Q What do you consider that amount to be? A The investment that we agreed on.").

Further, the $100,000 wire transfer also showed likely illegal activity by Mahmoud Kasem.  First, he agreed to let Elder use his bank account to deposit and wire the funds, funds he took with no questions asked.  Tr. at 10, 102 ("Q And what was supposed to happen to the money after it went in into the Garden Valley account? A He said it's supposed to wire to another location. Q What, if anything, did Mr. Elder say about where that money was coming from? A He didn't tell me about that. I don't know.").  Second, when Kasem left the bank to get more information, Elder was able to conduct the transaction and then wired the funds himself. 103, 104 (Q What happened upon your return? A The transfer was done. Q So what happened to that cash? A He deposited -- it was deposited into that account and it was wired like he said. Q Do you know where the wire was sent to? A No, sir.").  And in the face of this, Kasem claimed in the "beginning … was looking, legit, nothing wrong."  Tr. at 104, 105.

Finally, there was the text message, see GX 300, where Kasem said to Elder "I will com [sic] for u." This text and those that follow in this piece of evidence show that Kasem was not just unafraid of Elder, but that they were in a dispute about their relationship and not about any property.

So, in total, this evidence shows that there was no money, or personal property, that was the object of the extortion conspiracy, and Mr. Bryant should be acquitted of this conduct.

7

B. <u>Counts Eight – Physical Violence in Furtherance of Extortion and Nine – Unlawful Use of a Firearm in Connection With Extortion</u>

As to Count Eight, the defense submits that since, as described above, there is insufficient evidence of the extortion, this count must fail on lack of sufficiency of the predicate extortion. As to Count Nine, we again submit that because there is insufficient proof of the predicate extortion, Mr. Bryant should be acquitted of this count.

Furthermore, there is insufficient evidence that Mr. Bryant had dominion and control over the firearm used during the incident. Indeed, while McCoy provided self-serving testimony that he and Mr. Bryant knew a firearm would be involved, Tr. at 357, 362-368, his testimony showed that on the date of the incident, co-defendant Dwayne Ling merely told McCoy that he had the gun, but did not show it to McCoy or Mr. Bryant as they traveled to Garden Valley Distributors. Tr. at 368 ("Q When you met up with Mr. Ling that morning, was there any discussion of a gun? A No, but he told me he had it. Q He said he had it? A Yes. Q And what do you understand that to mean? A He had the gun. Q Did he show it to you? A No."). Furthermore, McCoy testified that the gun went off by accident. Tr. at 380 ("Q Did Mr. Ling have a reaction? A He said the gun just went off, he didn't do it intentionally."). Thus, there was insufficient evidence for the jury to conclude Mr. Bryant knew a weapon would be used.

C. <u>Count Ten – Causing Death Through Use of Firearm</u>

*1. Insufficiency*

We submit there is insufficient proof of: 1) malice aforethought because the government failed to prove extortion; or 2) that Mr. Bryant acted with an awareness of a serious risk of death or serious bodily harm as argued below. This same argument also shows why the Government's

8

proof against Mr. Bryant fails in showing that he aided and abetted the commission of these crimes, or that he is guilty as an accomplice.

### 2. *Extortion is not a Predicate for Felony Murder*

Count Ten should be dismissed because extortion is not a predicate for felony murder. The accusations alleged constitute neither first nor second-degree murder. First-degree murder does not apply because the government failed to allege a valid predicate act of murder, as defined in 18 U.S.C. § 1111(a). Extortion is not one of the prescribed crimes to serve as a predicate for "felony murder" and second-degree murder is inapplicable because Mr. Bryant was not the actor who shot Hani Kasem and second-degree murder includes an element that felony murder does not include "proof that the defendant acted with malice aforethought." *See United States v. Miguel,* 338 F.3d 995, 1004–05 (9th Cir. 2003) (quoting *United States v. Chischilly,* 30 F.3d 1144, 1159-60 (9th Cir.1994). The government has pointed to no case, in this Circuit or any other, where a defendant was prosecuted for "felony murder" with a predicate not listed in 18 U.S.C. § 1111(a). The government now attempts to interpret the obvious statutory ambiguity against the criminal defendants, in clear violation of the rule of lenity. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). The Supreme Court has repeatedly stressed that "'when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'" *Williams v. United States,* 458 U.S. 279, 290 (1982), quoting *United States v. Bass,* 404 U.S. 336, 347 (1971), quoting *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 221-222 (1952).

Extortion, as charged in Count Eight, cannot serve as a predicate for felony murder, as defined in 18 U.S.C. § 1111.  18 U.S.C. § 1111(a) defines murder as "the unlawful killing of a human being with malice aforethought.  Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.  Any other murder is murder in the second degree."  Absent from the list of predicates is extortion, for which Bryant was charged in Count Eight.  *Id.*

The death of another person and culpable *mens rea* ("malice aforethought") must be elements of the offense the government must prove to obtain a conviction that sustains a sentence for murder.  Henry S. Noyes, Felony-Murder Doctrine Through the Federal Looking Glass. 69 INDIANA LAW JOURNAL 533, 536 (1994).  The felony-murder doctrine relieves the state of the burden of proving premeditation or malice.  Nelson E. Roth & Scott E. Sundby, The Felony-Murder Rule: A Doctrine at Constitutional Crossroads, 70 CORNELL L. REV. 446, 460-78 (1985).  The Second Circuit has specifically indicated "A felony murder under federal law constitutes first-degree murder and includes the following predicate offenses: "any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery." *Santana Felix v. Barr*, 924 F.3d 51, 56, n.1, (2d Cir. 2019).  One element of felony murder under § 1111 is "the commission of an enumerated felony with the

10

requisite *mens rea* for the underlying" felony. *United States v. Chanthadara*, 230 F.3d 1237, 1259 (10th Cir. 2000) (internal citations omitted).

In construing a murder statute similar to § 1111, the Supreme Court in *Schad v. Arizona,* 501 U.S. 624, 639-40 (1991) explained. "At common law, murder was defined as the unlawful killing of another human being with 'malice aforethought.' The intent to kill and the intent to commit a felony were alternative aspects of the single concept of 'malice aforethought.' ... [S]tatutes have in most cases retained premeditated murder and some form of felony murder (invariably including murder committed in perpetrating or attempting to perpetrate a robbery) as alternative means of satisfying the mental state that first-degree murder presupposes." *Id*. (internal citations omitted); *see also United States v. Thomas*, 34 F.3d 44, 49 (2d Cir. 1994) (citing and acknowledging the same).

The statutory history of 18 U.S.C. § 1111 suggests Congress did not intend to include extortion as a felony murder predicate. The statutory history demonstrates that when Congress wanted to add felony murder predicates, Congress expanded the statute. 18 U.S.C. § 1111 was initially enacted in 1948. An amendment was made in 1984, when the crimes "escape, murder, kidnapping, treason, espionage, sabotage," were inserted after "arson" in subsection (a). *See* 98 P.L. 473, 98 Stat. 1837, § 1004 (Felony Murder Rule) (1984). A second amendment was made in 2003, when the crime "child abuse" was inserted after "or sexual abuse," and "or perpetrated as part of a pattern or practice of assault or torture against a child or children;" after "robbery" in subsection (a). *See* 108 P.L. 21, 117 Stat. 650, 652, 108 P.L. 21, 2003 Enacted S. 151, 108 Enacted S. 151, §102(1) (First Degree Murder For Child Abuse And Child Torture Murders) (2003).

11

### 3. Bryant did not commit Second Degree Murder

Second-degree murder includes an element that felony murder does not include: "proof that the defendant acted with malice aforethought." *See United States v. Miguel,* 338 F.3d at 1004-05 (9th Cir. 2003) (quoting *United States v. Chischilly,* 30 F.3d at 1159-60). As explained in *United States v. Miguel,* the Tenth Circuit in *United States v. Chanthadara* "held that second-degree murder was not a lesser included offense of felony murder because "the malice aforethought required for second-degree murder is different in kind, as opposed to degree, than the malice required for felony murder." 230 F.3d at 1237. Thus, the court could not "conclude that second-degree murder is necessarily subsumed by felony murder." *Miguel,* 338 F.3d, at 1005, n.43 (citations omitted).

Finally, there does not appear to be any cases where a federal defendant was convicted of second-degree "felony murder" under 18 U.S.C. § 1111(a) and "federal felony murder convictions have only been found where the killing occurred during the commission of one of the enumerated felonies requisite to establish the *mens rea* for first-degree felony murder." *See* Docket No. 275-3, Elder Memorandum at pp. 18, 19. "To the contrary, the Second Circuit has specifically explained that, when the felony murder doctrine applies, "Federal felony murder constitutes first-degree murder." *See United States v. Dos Reis*, 369 F.3d 143, 152 (2d Cir. 2004)." *Id.*

12

## II.    The Court Should Grant Mr. Bryant a New Trial

Pursuant to Fed. R. Crim. P. 33, Bryant moves for a new trial based on the Court's determination to seat only jurors who were vaccinated against COVID-19.

Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." See Fed. R. Crim. P. 33. This rule:

> by its terms gives the trial court broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice. The district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury. Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment. An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.
>
> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

See *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001) (internal quotation marks and citations omitted).

It is respectfully submitted that a new trial is warranted to prevent the manifest injustice which occurred in violation of Bryant's rights under the Jury Selection and Service Act of 1968,

13

28 U.S.C. § 1861 ("JSSA"), Sixth Amendment right to a jury drawn from a fair cross-section of the community, and rights under the Equal Protection Clause of the Fifth Amendment.

Mr. Bryant objected to the Court's decision to exclude individuals who were not vaccinated against COVID-19 from the impaneled jury. (Dkt. Nos. 324, 338, 347). The plan was in direct contradiction to the EDNY Plan for Resumption of Jury Trials, inconsistent with all other trials which have proceeded in the Eastern District since the pandemic, and the Administrative Office of the U.S. Courts made clear that getting the vaccine should not be a legal qualification for jury service. The Administrative Office spokesperson went as far as to say that "While courts may ask jurors COVID-19-related questions as part of their safety protocols, providing litigants with a jury selected at random from a fair cross-section of the community remains of greatest importance."[1]

Mr. Bryant's primary reason in objecting to limiting the jury to vaccinated individuals is the imbalance in vaccination rates based on race. Specifically, we cited studies that show that "Black and Hispanic people remain less likely than their White counterparts to have received a vaccine."[2] The risk manifested itself in our case in the absence of Black people on the jury, consistent with the racial imbalance in who is getting vaccinated. During jury selection, multiple Black people were excluded based on vaccination status and ultimately only one Black person deliberated and rendered the verdict. Specifically, five Black potential jurors were excluded due

---

[1] *Bloomberg Law,* Next Pre-Trial Question for Jurors: Are You Vaccinated?, May 28, 2021, https://news.bloomberglaw.com/us-law-week/next-pre-trial-question-for-jurors-are-you-vaccinated.

[2] *Latest Data on COVID-19 Vaccinations by Race/Ethnicity*, Kaiser Family Foundation (Published: Oct. 26, 2021) (last visited Oct. 28, 2021), https://www.kff.org/coronavirus-covid-19/issue-brief/latest-data-on-covid-19-vaccinations-by-race-ethnicity/.

14

to their vaccination status and only one Black person who was part of the deliberating jury.[3] Black people were not the only minorities to be adversely affected by the vaccination exclusion. One Hispanic, three "persons of color", and one South-Asian were excluded based on vaccination status. *Id*. Though White people represent 61.2% of the U.S. population, just four of the individuals struck as a result of their vaccination status were White.[4]

The impaneled jury ultimately did not resemble the diversity of the jurors excluded based on vaccination status. Preliminarily, there were only two women impaneled, and the remaining ten were males. Five of the jurors were White, only one was Black, three were Hispanic, two were South Asian, and one was a Person of Color.[5]

The Court's determination to exclude non-vaccinated individuals from the jury had a prejudicial effect on Mr. Bryant, and accordingly, Mr. Bryant is entitled to a new trial. *See, e.g.*, *United States v. Clemente*, 2004 U.S. Dist. LEXIS 627, at *21-22 (S.D.N.Y. 2004) ("Where a court concludes that despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury. Here, we conclude that permitting that verdict to stand under

---

[3] *See* September 15, 2021, Joint letter documenting prospective jurors' gender, perceived race, COVID-19 vaccination status, and whether or not they were struck by the Court for cause. Doc. No. 354 (Under Seal) ("Joint Letter").

[4] *Centers For Disease Control,* Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States https://covid.cdc.gov/covid-data-tracker/#vaccination-demographic (updating regularly).

[5] *See* Joint letter. We are not including the juror who was impaneled but got sick mid-trial and was excused, and the alternates who did not deliberate.

15

the facts of this case would result in a manifest injustice to the Defendant.") (internal citations omitted).

### III. Mr. Bryant Joins in Elder's Post-Trial Motions

Mr. Bryant joins the motions of his codefendant and any arguments that apply to his pretrial motions.

### CONCLUSION

For the reasons set forth above and based on the authorities cited herein, it is respectfully requested that the Court enter a judgment of acquittal or, in the alternative, order a new trial in the interests of justice.

Dated:     Brooklyn, New York
           November 1, 2021

>                          Respectfully submitted,
>
>                          ____s/_____
>                          MICHAEL HUESTON, ESQ.
>                          *Counsel for Defendant Wilbert Bryant*
>                          16 Court Street, Suite 1800
>                          Brooklyn, New York 11241
>                          (718) 246-2900
>
>                          EYLAN SCHULMAN, ESQ.
>                          *Associate Counsel for Defendant Wilbert Bryant*

16