JMS:GN/ALK
F. #2017R02045

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

PPASSIM ELDER,
          also known as "Bsam Elder,"
          "Big Sam" and "Sam," and
WILBERT BRYANT,
          also known as "Will" and "La,"

          Defendants.

Docket No. <u>18-CR-92 (S-5) (WFK)</u>

- - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN OPPOSITION
TO THE DEFENDANTS' POST-TRIAL MOTIONS

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Genny Ngai
Anna L. Karamigios
Assistant U.S. Attorneys
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ........................................................................................................... 2

I.  Procedural Background ......................................................................................... 2

   A.  The Indictment ................................................................................................ 2

   B.  Jury Selection ................................................................................................. 3

   C.  Trial ................................................................................................................ 4

II.  The Government's Case as to Counts Two and Seven through Ten ................................. 5

   A.  Bank Fraud Conspiracy (Count Two) ............................................................... 5

   B.  Extortion, Firearms, and Murder Offenses (Counts Seven through Ten) ..................... 9

ARGUMENT ............................................................................................................. 14

I.  The Evidence Supporting Count Two and Counts Seven through Ten Was Overwhelming
   .............................................................................................................................. 14

   A.  Rule 29 ......................................................................................................... 14

   B.  The Trial Evidence Proved Beyond a Reasonable Doubt that Bryant and Elder Are
      Guilty of Bank Fraud Conspiracy as Charged in Count Two ................................... 15

   C.  Evidence at Trial Proved Beyond a Reasonable Doubt that Bryant and Elder Are
      Guilty of the Extortion, Firearms, and Murder Offenses Charged in Counts Seven
      through Ten ..................................................................................................... 19

II.  The Court's Decision to Impanel Only Vaccinated Jurors Complied with the JSSA and
   the Constitution ................................................................................................... 27

   A.  Rule 33 ......................................................................................................... 27

   B.  The Vaccination Status of the Jurors Did Not Violate the Defendants' Rights .......... 27

CONCLUSION ........................................................................................................... 32

## TABLE OF AUTHORITIES

**CASES**

Alston v. Manson, 791 F.2d 255 (2d Cir. 1986)......................................................... 30

Castaneda v. Partida, 430 U.S. 482 (1977)....................................................... 30, 31

Duren v. Missouri, 439 U.S. 357 (1979) ................................................................ 31

Rosemond v. United States, 572 U.S. 65 (2014) ................................................... 23

Taylor v. Louisiana, 419 U.S. 522 (1975) ............................................................. 31

United States v. Aquart, 912 F.3d 1 (2d Cir. 2018) .............................................. 18

United States v. Contreras, 108 F.3d 1255 (10th Cir. 1997) ................................ 28

United States v. Eppolito, 543 F.3d 25 (2d Cir. 2008) ......................................... 26

United States v. Fazio, 770 F.3d 160 (2d Cir. 2014) ............................................ 21

United States v. Gambino, 59 F.3d 353 (2d Cir. 1995) ........................................ 27

United States v. Gordon, 987 F.2d 902 (2d Cir. 1993)......................................... 22

United States v. Jackman, 46 F.3d 1240 (2d Cir. 1996)....................................... 31

United States v. Jackson, 335 F.3d 170 (2d Cir. 2003) ........................................ 18

United States v. Jiau, 734 F.3d 147 (2d Cir. 2013) .............................................. 18

United States v. Klein, 913 F.3d 73 (2d Cir. 2019) .............................................. 15

United States v. Martoma, 894 F.3d 64 (2d Cir. 2017) ........................................ 15

United States v. McBrown, 149 F.3d 1176 (5th Cir. 1998)................................... 29

United States v. McCourty, 562 F.3d 458 (2d Cir. 2009) ..................................... 27

United States v. Monica, 295 F.2d 400 (2d Cir. 1961)......................................... 15

United States v. Pearson, 159 F.3d 480 (2d Cir. 1998) ........................................ 25

United States v. Pugh, 945 F.3d 9 (2d Cir. 2019)................................................. 15

United States v. Regnier, 44 F. App'x 524 (2d Cir. 2002) .................................... 25

United States v. Robinson, 799 F.3d 196 (2d Cir. 2015)................................. 23, 24

United States v. Rosa, 17 F.3d 1531 (2d Cir. 1994).............................................. 15

United States v. Schulte, No. S3 17 CR. 548 (PAC), 2021 WL 1146094
    (S.D.N.Y. Mar. 24, 2021) .............................................................................. 30

United States v. Spriggs, 102 F.3d 1245 (D.C. Cir. 1996) ..................................................... 28

United States v. White, 673 F.2d 299 (10th Cir. 1982) ........................................................ 15

United States v. White, 7 F.4th 90 (2d Cir. 2021) ........................................................... 14, 21

United States v. Williams, 927 F.2d 95 (2d Cir. 1991) ........................................................ 28

**STATUTES**

18 U.S.C. § 1111(a) .................................................................................................... 25, 26

18 U.S.C. § 924(c) ................................................................................................... 1, 2, 21

18 U.S.C. § 924(j) .................................................................................................... 1, 2, 25

28 U.S.C. § 1866(c) ............................................................................................... 4, 28, 29

The government respectfully submits this memorandum of law in opposition to the defendants' post-trial motions for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29"), or alternatively, a new trial under Rule 33 of the Federal Rules of Criminal Procedure ("Rule 33").

<u>PRELIMINARY STATEMENT</u>

On October 1, 2021, following a three-week trial, a jury convicted the defendants Ppassim Elder and Wilbert Bryant of (1) committing physical violence in furtherance of extortion and extortion conspiracy against Mahmoud and Hani Kasem, in violation of 18 U.S.C. § 1951(a) (Counts Seven and Eight); (2) using, brandishing, discharging and causing the death of Hani Kasem through the use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1) (Counts Nine and Ten); and (3) conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Two). The jury additionally convicted Elder of three additional counts of bank fraud conspiracy, in violation of 18 U.S.C. § 1349 (Counts One, Three and Five); committing physical violence in furtherance of an extortion against Mohammed and Ibrahim Rabah, in violation of 18 U.S.C. § 1951(a) (Count Four); access device fraud, in violation of 18 U.S.C. §§ 1029(a)(1) and 1029(c)(1)(A)(i) (Count Six); conspiring to make false statements and making false statements, in violation of 18 U.S.C. §§ 371 and 1001(a)(2) (Counts Eleven and Twelve); and aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Thirteen).

Both defendants now move under Rule 29 to overturn the jury's guilty verdicts on Count Two and Counts Seven through Ten, arguing that the trial evidence was insufficient on those counts. See ECF No. 382 ("Bryant Br."); ECF No. 383 ("Elder Br."). The defendants also move for a new trial under Rule 33 based on the Court's determination to seat only jurors

1

who were vaccinated against Covid-19.  <u>See</u> Bryant Br. 13-16; Elder Br. 11 (joining in Bryant's motions).

       The defendants' motions are meritless and fall far short of meeting their heavy burdens under Rules 29 and 33.  As detailed below, the government presented overwhelming evidence at trial—including substantial documentary evidence, extensive financial records, and the testimony of cooperating, expert and civilian witnesses—that proved the defendants' guilt beyond a reasonable doubt.  Additionally, as detailed in extensive pre-trial briefing, the Court acted within its broad discretion under the Jury Selection and Service Act in seating only vaccinated jurors.  Moreover, the defendants have not demonstrated that that decision violated their constitutional rights.  In short, the defendants' motions to overturn the jury's unanimous verdicts, and for a new trial, should be denied in their entirety.

BACKGROUND

I.    <u>Procedural Background</u>

    A.    <u>The Indictment</u>

       On March 12, 2020, a grand jury sitting in the Eastern District of New York returned a Fifth Superseding Indictment (the "Indictment") charging both Elder and Bryant with: (1) committing physical violence in furtherance of the extortion of Mahmoud and Hani Kasem and extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Counts Seven and Eight); (2) using, brandishing, discharging and causing the death of Hani Kasem through the use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1) (Counts Nine and Ten); and (3) conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Two).  <u>See</u> ECF No. 230.  The Indictment additionally charged Elder with:  (1) three additional counts of bank fraud conspiracy, in violation of 18 U.S.C. § 1349  (Counts One, Three and Five);

2

(2) committing physical violence in furtherance of the extortion of Mohammed and Ibrahim Rabah, in violation of 18 U.S.C. § 1951(a) (Count Four); (3) access device fraud, in violation of 18 U.S.C. §§ 1029(a)(1) and 1029(c)(1)(A)(i) (Count Six); (4) conspiring to make false statements and making false statements, in violation of 18 U.S.C. §§ 371 and 1001(a)(2) (Counts Eleven and Twelve); (5) aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Thirteen); and (6) obstructing justice, in violation of 18 U.S.C. § 1503 (Count Fourteen).  See id.

      B.    Jury Selection

Before jury selection began, the Court indicated its preference to seat only vaccinated jurors.  On September 2, 2021, the defendants objected to the Court's proposal, arguing, among other things, that this would violate the Jury Selection and Service Act ("JSSA") and the Fifth and Sixth Amendments because "[e]xcluding non-inoculated jurors will lead to a further underrepresentation of minorities in our impaneled jury."  ECF No. 324.

On September 2 and September 3, 2021, the Court issued orders denying the defendants' application.  In doing so, the Court made explicit factual findings based on evidence presented by the government, including, among other things (i) at the time of trial, the New York City metropolitan area was documented as having a high incidence of COVID-19; (ii) the trial would be held in a single room for approximately three weeks, five days a week; (iii) there would be a large number of participants in the trial, including counsel, Court staff, defendants and United States Marshals, which would increase the risk of transmission of COVID-19; (iv) the COVID-19 vaccines approved in the United States are both effective at preventing the contraction and transmission of the disease; and (v) if an unvaccinated juror were to contract COVID-19, it would likely disrupt the proceedings by, among other things,

requiring delays for quarantining and by possibly also infecting others.  ECF No. 328.  With these factual findings, the Court concluded that seating unvaccinated jurors would both constitute an "undue hardship" on them and also would "likely disrupt the proceedings" under 28 U.S.C. § 1866(c)(1), (2).  See id.

The parties submitted additional letters regarding this issue, and the Court ultimately determined to seat only vaccinated jurors.  Jury selection then took place on September 13 and September 14, 2021 and an all-vaccinated jury was selected and sworn in thereafter.

C.    Trial

Trial began on September 20, 2021.  On October 1, 2021, the jury unanimously found Elder guilty on Counts One through Thirteen[1] and Bryant guilty on Counts Two and Seven through Ten of the Indictment.  See generally ECF No. 362.  With respect to Count Nine (the firearms charge), the jury found Elder and Bryant guilty of brandishing and discharging a firearm.  Id.  With respect to Count Ten (the murder charge), the jury found Elder and Bryant guilty on three separate and independent grounds:  accomplice liability, felony-murder and on the basis that the defendants acted with an awareness of a serious risk of death or serious bodily harm.  Id.

---

[1]    The jury acquitted Elder on Count Fourteen, which charged him with obstruction of justice.

II.     The Government's Case as to Counts Two and Seven through Ten

Because the defendants challenge the sufficiency of the evidence as to only Count Two and Counts Seven through Ten, the government sets forth the central evidence supporting these charges below.[2]

A.      Bank Fraud Conspiracy (Count Two)

Count Two of the Indictment alleged that between July 2012 and August 2012, Elder and Bryant knowingly and intentionally conspired to execute a scheme and artifice to defraud TD Bank by falsely stating in an account-opening document that Bryant was the beneficial owner of a bank account when, in fact, Elder was the beneficial owner of that account.

The government's evidence on this count, including witness testimony and bank records, established that, in approximately the spring of 2012, Elder asked government witness Frederick McCoy, if Elder could use a bank account in McCoy's name to receive and withdraw money.  Tr. 345-46.[3]  McCoy declined, but indicated that he could find someone else who was willing to do it.  Tr. 346.  McCoy then contacted Bryant, who told McCoy that he was interested in committing this crime with Elder.  Tr. 346-47.  Accordingly, McCoy put Bryant and Elder in touch.  Tr. 346.

_____

[2]     During its case-in-chief, the government introduced testimony from 39 witnesses and admitted over 150 exhibits.  The evidence cited herein is only a summary of certain evidence supporting the relevant counts and does not include all of the trial evidence that supported these counts.

[3]     Elder and McCoy first met in 2011, when they were incarcerated together on Rikers Island.  Tr. 344-45.

Then, in July 2012, Bryant opened an individual checking account in his name, with his address, at TD Bank.  See GX 209A; Tr. 848-49.  Bank records reflect that Bryant had a beginning account balance of only $5.00, but that approximately a month later, on August 17, 2012, he received a $32,000 wire transfer from an Oklahoma-based individual named Thomas Hardy in connection with a car-related transaction.  See GX 209B; GX 209C; Tr. 849-50.  Records also indicated that less than one week after Bryant received the transfer, he made four over-the-counter cash withdrawals from different TD bank locations in Brooklyn, which totaled $28,000.  See GX 209B; GX 209D; Tr. 848-855.  The cash withdrawals occurred over the span of three days, from August 21 to August 23, 2012, with two of the cash withdrawals occurring on the same day from two separate TD bank locations in Brooklyn.  See GX 209B; GX 209D.

At some point in 2012, Bryant paid McCoy $1,000 in cash as a "finder's fee" for connecting Bryant with Elder.  Tr. 347-48.  Based on that conversation with Bryant, McCoy understood that Bryant and Elder had committed the crime.  Id.

The evidence at trial further proved that Elder and Bryant engaged in criminal banking activity.  Kristy Gabel, a former investigator with J.P. Morgan Chase Bank, testified (and related bank records corroborated) that, after a customer named Amy Kronethal reported unauthorized withdrawals from her account, Ms. Gabel conducted an investigation that revealed that Bryant was involved in a fraudulent takeover of Ms. Kronethal's account in 2012.  Tr. 725-38; GX 204.  Specifically, Ms. Gabel's investigation revealed that, on August 16, 2012, the phone number associated with Ms. Kronethal's account was changed to a phone number belonging to Ahmad Zahrieh (government witness and one of Elder's bank fraud co-conspirators).  Tr. 732-33; GX 204.  The following day, someone using Ms. Kronethal's

6

account added "Wilbert Bryant," with email address WillByrant01@gmail.com [sic], as a payment recipient and attempted to send $1,750 to him. Tr. 734-36; GX 204. However, the user then cancelled that payment the same day. Tr. 735-36. The user then changed the email address for "Wilbert Bryant" to Bryant's correct email address, WillByrant01@gmail.com, Tr. 737; GX 204; GX 505 (Google subscriber records for defendant Bryant), and again attempted to send him $1,750 from Ms. Kronethal's account, Tr. 736-37; GX 204. However, a JP Morgan employee cancelled the payment due to the suspicious nature of the transaction. Tr. 737-38. The evidence at trial further established that Elder, while not specifically identified in the bank records (as was his proven modus operandi), was the key link to the fraudulent bank activity: although Zahrieh and Bryant were implicated in the scheme, Zahrieh did not know Bryant or Amy Kronethal. Tr. 702.

The government's evidence also established that Bryant's banking activity was consistent with Elder's repeated pattern of committing bank fraud with others. For example, government witness Ahmad Zahrieh testified that he participated in a nearly identical bank fraud scheme with Elder on three occasions. That testimony was corroborated by bank records admitted at trial. Indeed, Zahrieh testified and bank records reflected that, in December 2012, just a few months after the above-described bank fraud, Zahrieh opened a checking account with Bank of America in his own name, but for Elder to use. Tr. 678, 750; GX 200A. Zahrieh's beginning account balance in February 2013 was $6.28. See GX 200B. Then, on February 20, 2012, Zahrieh received a wire transfer for $21,200 from an individual named Iris Krome relating to a vacation rental. See GX 200B. Zahrieh then made three separate cash withdrawals, at three separate Bank of America locations, which totaled approximately $18,500. GX 200B; GX 701; Tr. 754-55. Zahrieh testified that he did not know an individual

named Iris Krome, Tr. 679, that Elder had orchestrated the wire transfer, id., and that Elder had instructed Zahrieh to withdraw nearly all of the funds in cash and give it to Elder, Tr. 680-81.  In exchange, Elder let Zahrieh keep some of the money.  Tr. 681.  Zahrieh testified that he committed the same bank fraud scheme with Elder on two additional occasions.  Tr. 675-78, 694-96.  Both times, Zahrieh opened a bank account in his name for Elder to use, and provided the account information to Elder.  Then tens of thousands of dollars were transferred to the account, after which Zahrieh withdrew the majority of it in cash and gave it to Elder. GX 200A-C; GX 203A-B; GX 205A-C; GX 701-1 - 701-3; Tr. 675-81, 694-96.

        The government's evidence further proved that Elder committed the same type of bank fraud scheme with government witness Mohammed Rabah.  Rabah testified that, in late 2015, Rabah opened a bank account at TD Bank in his name, but for Elder to use.  GX 207A; Tr. 880-81.  After opening the account, Rabah provided the account details to Mahdi Abdel-Rahim, who gave them to Elder.  Tr. 881.  As reflected in bank records, Rabah's beginning account balance was $23.35.  GX 207B; Tr. 831.  Then, in January 2016, Rabah received a wire transfer for $31,700 from a Washington-based individual named Cordell Newby, a fraud victim who testified at trial that he sent the money to Rabah intending to purchase a car.  GX 207B; Tr. 810, 819-21.  Rabah then withdrew most of the money in cash in separate transactions at various TD Bank locations in Brooklyn.  GX 207C; Tr. 834-38. Pursuant to the scheme, Rabah was expected to give most of the money to Elder.  Tr. 881-883. When Rabah did not give the money to Elder, Elder violently extorted Rabah and his brother, Ibrahim.  Tr. 883-87, 921-40.  More specifically, Elder threatened to kill Rabah, and went to Rabah's home and assaulted Rabah's older brother to "send a message" to Rabah.  Tr. 884-87, 906, 934-35.

Bank representatives for all of the financial institutions involved in the bank fraud conspiracies testified to the materiality of the false statements the defendants made about the bank accounts.  For example, Joanie Galestro, a regional operations officer for TD Bank, testified that TD Bank is required, by law, to know the identities of all of the individuals who will be using or controlling a bank account, and that the bank relies on that information in determining whether to open an account for the applicant.  Tr. 826-29.  As Ms. Galestro explained, if TD Bank does not know who will be using the account, "[t]here could be potential for some either fraudulent activity, [or] criminal activity."  Tr. 826.  Other representatives testified similarly.  Tr. 649-53, 751-52, 1091-93.

B.      Extortion, Firearms, and Murder Offenses (Counts Seven through Ten)

Counts Seven through Ten of the Indictment were based on Elder and Bryant's extortion of Mahmoud and Hani Kasem and the murder of Hani Kasem.  Specifically, Counts Seven and Eight charged Elder and Bryant with extortion conspiracy and committing physical violence in furtherance of the extortion of Mahmoud and Hani Kasem.  Counts Nine and Ten charged Elder and Bryant with using, brandishing, discharging and causing the death of Hani Kasem through the use of a firearm.

The government's evidence on these charges, including testimony from law enforcement, civilian, expert and cooperating witnesses, and cellphone location data, text messages, toll records, bank records and surveillance video from outside Garden Valley Distributors, established that, in late 2016, Elder led Mahmoud Kasem to believe Elder wanted to invest in the small wholesale store that Mahmoud and his family owned called Garden Valley Distributors.  Tr. 78, 88-92.  Under that guise, Elder gave Mahmoud approximately three to four checks, totaling about $70,000 to $80,000, to deposit into Garden Valley's bank

account.  Tr. 92.  After Mahmoud deposited these checks, Elder told Mahmoud to withdraw some of the funds in cash and give it to Elder.  Tr. 93-96.  Mahmoud complied, and then used the remaining money, which he believed was Elder's investment in Garden Valley Distributors, to buy merchandise for the store.  Id.  In February or March of 2017, Elder used Garden Valley's account to wire $100,000.  Tr. 101-105.  After this transaction (and after speaking to his father and accountant), Mahmoud testified that he refused to allow Elder to use Garden Valley's account again.  Tr. 105-108.  In response, Elder "got mad," "start[ed] cursing [Mahmoud] out," and told Mahmoud to "bring him back the money from the checks," which Elder claimed was "40 or 50,000" dollars.  Tr. 108-09.  Mahmoud, however, was unable to pay Elder because he had used the money to buy merchandise for the store.  Id.  Mahmoud offered to pay Elder back in installments, but Elder demanded all of the money immediately. Tr. 108-110.

When Mahmoud could not pay, Elder began a persistent campaign of intimidation against the Kasem family.  Mahmoud Kasem testified that, throughout the spring of 2017, Elder threatened Mahmoud "15 or 20 times."  Tr. 110-11.  He threatened to shoot Mahmoud Kasem in the leg and to send "black, Spanish" people after Mahmoud.  Id.  He told Mahmoud that he would "come and break the windows at [the Kasem's] house."  Tr. 111.  As Fozieh Kasem testified, Elder also threatened Hani Kasem in person at a wedding, just weeks before Bryant and his co-conspirators murdered Hani Kasem.  Tr. 616-19.

The evidence at trial also proved that Elder followed through on his threats. Sabreen Kasem testified that, on one occasion, Elder and another man barged into the Kasems' home, angrily calling for Mahmoud and frightening Sabreen and her children, who lived on the ground floor.  Tr. 586-87.  Mohammed Rabah testified that, in approximately April 2017,

10

Elder paid Mahdi Abdel-Rahim to throw a rock through the window of the Kasems' home.  Tr. 888-91.  Sabreen Kasem was home on one occasion when someone threw a rock and broke the window of the Kasems' home.  Tr. 589-91.  Around the same time that year, the windshield of a car parked in the Kasems' driveway was shattered with a large rock.  Tr. 111-13, 591.

McCoy testified that, when Mahmoud Kasem had still not paid Elder, Elder hired Bryant and McCoy to collect the money.  As reflected in phone records, on July 8, 2017, Elder called McCoy "out of the blue" and asked McCoy to help recover money that Elder claimed to be owed.  GX 301C; Tr. 352-54.  Immediately after he got off the phone with Elder, McCoy called Bryant and relayed Elder's request.  Tr. 353-55; GX 301B; GX 301C.  The next day, on July 9, Elder threatened Mahmoud in text messages, telling Mahmoud, "Wake up.  They coming your way.  Ramadan is over."[4]  See GX 300.

After Elder's initial call with McCoy, Elder met with McCoy and Bryant at a Dunkin Donuts on Fourth Avenue and Atlantic Avenue in Brooklyn to discuss the extortion plan.  Tr. 352-58; GX 700 (cell-site location map reflecting meeting).  During this meeting, Elder offered $10,000 to Bryant and McCoy if they would extort Mahmoud Kasem at gunpoint.  Tr. 358.  According to McCoy, Elder told Bryant and McCoy that Elder's "cousin" (Mahmoud Kasem) owed him $50,000; that he wanted McCoy and Bryant to "retrieve that money;" and that "it would be best if [Bryant and McCoy] went with a gun to put the fear of God in [Mahmoud]."  Tr. 355-57.  McCoy further testified that Elder paid McCoy and Bryant $500 as an upfront deposit towards the promised $10,000.  Tr. 358-59.

---

[4]	As Mahmoud Kasem explained, during the holiday of Ramadan "nobody can hurt anybody, nobody can touch anybody."  Tr. 138.

After this meeting, Elder continued to "press" McCoy and Bryant to collect the money from Mahmoud, and provided them with Garden Valley's address.  Tr. 359-60.  In the weeks leading up to the murder of Hani Kasem, McCoy and Bryant went to Garden Valley to conduct surveillance.  Tr. 358-61.  On one of these trips, McCoy called Elder "to let him know, okay, I seen him [Mahmoud], we got a look at him, I know where his store is at and things of that nature."  Tr. 361.  Cell site location data from October 16, 2017 to October 20, 2017 corroborated McCoy's testimony.  GX 700; Tr. 557-60.

McCoy also testified that he and Bryant procured a gun, as Elder requested.  Neither McCoy nor Bryant owned a gun, so McCoy suggested to Bryant that they contact an individual named Dwayne Ling.  Tr. 362-63.  McCoy thought of Ling because he knew Ling had shot someone before.  Tr. 363.  McCoy spoke with Ling about the gun on two separate occasions.  During the first conversation, McCoy offered Ling a "percentage" of Elder's $10,000 payment if Ling could provide a gun.  Tr. 363-65.  During the second conversation, Ling confirmed, in Bryant's presence, that he "was able to obtain" the gun and was "willing to participate" in the extortion.  Tr. 365-66.

Witness testimony, surveillance footage, DNA evidence recovered from McCoy's car, and physical evidence recovered from Garden Valley proved that on October 23, 2017, McCoy, Bryant and Ling carried out the armed extortion.  That morning, McCoy picked up Bryant and Ling in his girlfriend's black Lexus and drove to Garden Valley.  Tr. 366-73.  As planned, the three men entered the store in single file:  McCoy, Bryant, then Ling.  GX 513.  Mahmoud Kasem, Hani Kasem, Anjane Ramnath and Rolando Mojica were working inside the store that morning.  Per witness testimony, McCoy announced that they were "here for that money.  We're here for Sam."  Tr. 124, 255, 279, 377.  Bryant also stated that they

12

were there for Elder.   Tr. 377.   McCoy testified that they said this because they wanted Mahmoud to understand "what the whole purpose of us being there [was] for" – "to retrieve some money that was owed to [Elder]."  Tr. 376.

Testimony from McCoy and multiple eyewitnesses further established that while McCoy spoke to Mahmoud, Ling brandished a gun and Bryant blocked the door.  Tr. 124, 256-57, 277-78, 375.  When Mojica saw the gun, he went for the door to go get help, and Bryant tried to stop him from leaving.  Tr. 256-57.  McCoy then grabbed the gun from Ling and pistol-whipped Mahmoud in the head.  Tr. 124-25, 377-78.  The gun fell to the ground, and Mahmoud and McCoy began wrestling. Tr. 126, 378.  Ling picked up the gun and aimed at Mahmoud.  Tr. 127, 281.  During all of this, Bryant "stayed right at the front door."  Tr. 378. He also instructed Ramnath not to touch her phone when she attempted to call 911.  Tr. 281-82. After fighting with Mahmoud, McCoy decided to flee the store.  Tr. 378-79.  As is reflected on surveillance video from outside the store, Bryant and Ling were still inside when McCoy left.  Tr. 128, 379.  Hani Kasem attempted to get out of the store, but Bryant and Ling kept him inside.  Tr. 282.  During the struggle, Ling fired the gun, shooting Hani Kasem in the face, severing his spinal cord and killing him.  Tr. 175, 282, 379-80.

Bryant and Ling fled back to McCoy's car and the three "got out of dodge."  Tr. 380.  Hani Kasem was later pronounced dead.  Tr. 167-68.

ARGUMENT

I.    The Evidence Supporting Count Two and Counts Seven through Ten Was
      Overwhelming

Both defendants move under Rule 29 for the Court to overturn the jury's

unanimous verdicts and enter a judgment of acquittal on Count Two and Counts Seven through

Ten, contending that the government's evidence was insufficient on these counts.  As set forth

below, the defendants wholly ignore significant evidence and reasonable inferences that the

jury was permitted to draw from that evidence.  Contrary to the defendants' contentions, the

trial evidence supporting  these counts was overwhelming, and the defendants' motions should

be denied.

A.    Rule 29

"If the jury has returned a guilty verdict, the court may set aside the verdict and

enter an acquittal pursuant to Federal Rule of Criminal Procedure 29(c), but it may do so only

when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond

a reasonable doubt."  United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation

marks omitted).  "A conviction must be upheld if any rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt," and the evidence must be

viewed "in the light most favorable to the government, crediting every inference that could

have been drawn in the government's favor, and deferring to the jury's assessment of witness

credibility and its assessment of the weight of the evidence."  Id. (internal quotation marks

omitted) (emphasis in original).  "In other words, the court may enter a judgment of acquittal

only if the evidence that the defendant committed the crime alleged is 'nonexistent or so

meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  United States v.

14

Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)).

Thus, a defendant challenging a jury's guilty verdict "bears a heavy burden." United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017), cert. denied, 139 S. Ct. 2665 (2019) (internal quotation marks omitted).  In assessing a Rule 29 motion under this standard, a reviewing court must consider the evidence as a whole, not in isolation.  United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019).  This is so because "each fact may gain color from others." Guadagna, 183 F.3d at 130 (citing United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961)).

In addition to resolving any issue regarding witness credibility in the government's favor, the Court must leave to the jury the task of choosing among permissible competing inferences that can be drawn from the evidence.  See, e.g., United States v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019).  In deciding which inferences to draw, the jury is entitled to use its common sense, Klein, 913 F.3d at 79, and "[t]he fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable,"  United States v. Rosa, 17 F.3d 1531, 1542 (2d Cir. 1994).

B.     The Trial Evidence Proved Beyond a Reasonable Doubt that Bryant and Elder Are Guilty of Bank Fraud Conspiracy as Charged in Count Two

With respect to their convictions on Count Two for bank fraud conspiracy, the defendants argue that the guilty verdict must be overturned because: (1) the government did not call as a trial witness Thomas Hardy, the individual who wired $32,000 into Bryant's bank account, to testify that his payment was induced by fraud; (2) the government purportedly did not prove that Elder was the beneficial owner of Bryant's bank account; and (3) the

government also allegedly did not prove that Elder received any portion of the funds wired by Hardy.  See Bryant Br. 8-9; Elder Br. at 6.

The defendants' contentions are meritless.  First, the defendants' argument that the government failed to prove this count because it did not call Thomas Hardy to testify that he was a fraud victim mischaracterizes the law.  As the Court correctly instructed the jury, to prove bank fraud conspiracy, the government must show that the object of the conspiracy (bank fraud) involved a "scheme to defraud a bank or a scheme to obtain money or funds owned or under the custody or control of a bank by means of false or fraudulent pretenses, representations or promises."  Tr. 1534.  Thus, the government was required to prove only that Elder and Bryant conspired to defraud TD Bank or to obtain money under the control of TD Bank by means of false or fraudulent pretenses, representations or promises.  The government was not required to prove any scheme to defraud Thomas Hardy.

Second, the government provided ample evidence from which the jury was permitted to infer that Elder was the beneficial owner of Bryant's TD Bank account.  As detailed above, in spring 2012, McCoy connected Elder and Bryant for the very purpose of committing bank fraud.  Tr. 345-348.  Weeks later, on August 17, 2012, Bryant opened a checking account with TD Bank, in his own name, with a starting balance of only five dollars.  GX 209B.  And less than one week after that, the account received a wire transfer from Thomas Hardy for $32,000.  Id.  Consistent with each of the other bank frauds that the government proved at trial, Bryant then withdrew the majority of the money in cash at different bank locations.  GX209B; GX 209D; Tr. 848-855.  From this evidence alone, the jury was permitted to infer that Elder and Bryant committed bank fraud.  But  McCoy's testimony made that fact indisputably clear:

Q.     What's the next that you heard about it?

A.     When La had came to me and handed me some money.

Q.     How much did he hand you?

A.     $1,000

Q.     What is your understanding of why Mr. Bryant gave you $1,000?

A.     It was like a finder's fee.

Q.     For putting Mr. Bryant and Mr. Elder in contact together?

A.     Yes.

Q.     Where did he give this to you?

A.     Around my way.

Q.     Near your apartment?

A.     Yes.

Q.     Did he give it to you in check or cash?

A.     He gave it to me in cash.

Tr. 347-48.  The jury was permitted to infer that Bryant would not have paid McCoy $1,000 in cash unless Bryant and McCoy had successfully executed the bank fraud scheme.

Further still, the government presented additional evidence at trial that connected Elder and Bryant to joint criminal banking activity:  testimony and bank records from JP Morgan Chase that established Bryant and Zahrieh were associated with the same fraudulent bank account takeover scheme and that Elder was their only connection.  Tr. 725-38; GX 204.

Third, Elder's argument that the Court should overturn the jury's verdict on this count because the government did not prove that he received any of the money is also meritless. As an initial matter, based on the extensive evidence regarding Elder's repeated pattern of committing bank fraud, including with Bryant, and the fact that Bryant withdrew nearly all of the money in cash (but some remained in his account), the jury could permissibly infer that proceeds of the bank fraud went to Elder.  In any event, Elder wholly ignores that the government charged, and the jury convicted, him of <u>conspiring</u> to commit bank fraud.  As the Court correctly instructed the jury, the government was required to prove only the existence of an agreement to commit bank fraud (the unlawful object of the charged conspiracy), and that the defendant knowingly and willfully became a member of that conspiracy.  Tr. 1522-27, 1532-39; <u>see also</u> <u>United States v. Jackson</u>, 335 F.3d 170, 180-82 (2d Cir. 2003).  In other words, the government was required to prove only that Elder knowingly agreed with Bryant to commit bank fraud—not that the bank fraud was successful or that Elder received any of the proceeds.  As explained in detail above, the government admitted ample evidence from which the jury could conclude that Elder and Bryant conspired to commit bank fraud.

Finally, to the extent that the defendants claim that they should prevail on their motions for acquittal because the evidence of the bank fraud conspiracy "equally supports competing theories of guilt and innocence," <u>see</u> Bryant Br. at 8, that argument also fails. Factual infirmity aside, this argument misstates the law.  The Second Circuit has made clear that this rule applies "only where the evidence 'is nonexistent or so meager' as to preclude the inferences necessary to a finding favorable to the government.'"  <u>United States v. Aquart</u>, 912 F.3d 1, 44-45 (2d Cir. 2018) (citing <u>United States v. Jiau</u>, 734 F.3d 147, 152 (2d Cir. 2013)). In this case, as detailed above, the trial evidence was more than sufficient to sustain the

defendants' convictions on Count Two.  Accordingly, the defendants' motions to overturn the guilty verdict on Count Two should be denied.

C.     Evidence at Trial Proved Beyond a Reasonable Doubt that Bryant and Elder Are Guilty of the Extortion, Firearms, and Murder Offenses Charged in Counts Seven through Ten

The defendants raise various sufficiency challenges to the government's evidence with respect to Counts Seven through Ten, which relate to the extortion of Mahmoud and Hani Kasem and the murder of Hani Kasem.  As set forth below, these arguments rehash trial arguments that the jury rejected and ignore the evidence offered at trial and reasonable inferences that the jury was permitted to draw from that evidence.

The defendants first contend that the government did not prove the extortion conspiracy charged in Count Seven because there is "insufficient evidence that [they] conspired to wrongfully obtain or take the personal property of another, or from the presence of another."   Bryant Br. 5-7.  Specifically, the defendants appear to argue that witness testimony about the ownership of Garden Valley and its profits show that the store did not need an investor and, therefore, Mahmoud Kasem and Elder "were in a dispute about their relationship," as opposed to one about the business loan.  Id. at 7.

This argument strains credulity.  The overwhelming evidence at trial established that Elder, Bryant and their co-conspirators extorted Mahmoud and Hani Kasem at gunpoint for money, which, as the Court correctly instructed the jury, constitutes "property" under the statute.  Tr. 1541-42.  For example, Mahmoud Kasem testified that, when he refused to let Elder use Garden Valley's bank account to wire money, Elder demanded approximately $40,000 to $50,000, which Elder claimed Mahmoud owed him from earlier deposits Elder had made into the store's account.  Tr. 109-110.  When Mahmoud could not give him that amount,

Elder threatened Mahmoud and his family, directed his associates to damage the Kasems'

home, and, ultimately, hired Bryant and McCoy to extort Mahmoud at gunpoint. To that end,

McCoy testified that the object of the extortion conspiracy was to get $50,000 from Mahmoud,

not to pursue an interpersonal vendetta:

> A.   Sam, he expressed to us that a family member owed him
>       some money and he wanted us to retrieve it, you know.
>
> Q.   Did he give a relationship in terms of what type of family
>       member?
>
> A.   A cousin.
>
> Q.   And he said the cousin owed Mr. Elder some money?
>
> A.   Yes.
>
> Q.   How much did Mr. Elder say his cousin owed him money?
>
> A.   $50,000.
>
> Q.   And what, if anything, did Mr. Elder want from you and
>       Mr. Bryant?
>
> A.   He wanted us to retrieve that money. It was like – he was
>       adamant about it because he was like peeved off that his
>       cousin was his taking his time trying to get that money
>       back to him. So he was upset at that and he was real
>       adamant about us getting that money back.
>
> Q.   Did he tell you how you should get the money back?
>
> A.   He told us, you know, it would be best if we went with a
>       gun to put the fear of God in him.

Tr. 356-57. Bryant asserts that that there was purportedly inconsistent witness testimony about

which Kasem family member technically owned Garden Valley and the store's income, and

that such inconsistencies "contradicted Mahmoud Kasem's supposed reason for needing funds

from Elder to expand the business." Bryant Br. 10. But who owned Garden Valley and how

much the store earned is irrelevant.  The evidence at trial unquestionably established that the object of the extortion conspiracy was to get money from Mahmoud Kasem.  Moreover, Bryant's argument about purportedly inconsistent testimony goes to witness credibility and the weight of the evidence, and, as explained above, the jury's assessment of witness credibility and its assessment of the weight of the evidence are entitled to deference here.  See White, 7 F.4th at 98.  The jury credited testimony that the sole objective of the extortion conspiracy was to get money from Mahmoud Kasem, as it was entitled to do, and any attempt to reverse the defendants' convictions on this ground is baseless.[5]

Both defendants also challenge their convictions on Count Nine, for using, carrying and brandishing a firearm, on the basis that the trial evidence was insufficient to prove that they had advance knowledge[6] that a gun would be used in the extortion.  Elder Br. 2; Bryant Br. 8.  The defendants again ignore significant trial evidence in so arguing.[7]

---

[5]    To the extent Bryant argues that the object of the extortion conspiracy must be lawfully possessed money, that argument fails, too.  As an initial matter, Bryant did not request a jury instruction to that effect and therefore has not preserved the argument.  In any event, it is well-established that "[i]t does not matter if the victim's initial acquisition or possession of the tangible property was illegal, or if the business in which the victim is engaged is illegal." Sand, Instruction 50-11; United States v. Fazio, 770 F.3d 160, 167-68 (2d Cir. 2014).

[6]    Elder concedes that the Court correctly instructed the jury on the advance knowledge requirement for a conviction under Title 18, United States Code, Section 924(c). Elder Br. 7.

[7]    Moreover, as explained above, the jury indicated on a special verdict sheet that the defendants were guilty of causing the death of Hani Kasem through the use of a firearm under a Pinkerton theory of liability.  Accordingly, even if the evidence was insufficient to show that the defendants had advance knowledge of the firearm, their convictions would still stand.

With respect to Elder, the trial evidence established that Elder specifically instructed Bryant and McCoy to use a gun in their extortion efforts.  According to McCoy's testimony, Elder was "peeved off that his cousin was taking his time trying to get that money back to him;" "was real adamant about us getting that money back;" and told Bryant and McCoy to "go with a gun to put the fear of God in [Mahmoud Kasem]."  Tr. 357.  McCoy further testified that he and Bryant agreed to commit this extortion for Elder; that Elder paid them $500 as a deposit and sent them the address for Garden Valley; and that McCoy spoke with Elder days before the extortion to confirm that he and Bryant had the right location and intended victim.  Tr. 357-363.  In short, the evidence at trial established that Elder offered Bryant and McCoy $10,000 to commit the extortion and instructed them to bring a gun, he paid Bryant and Elder $500 in advance, and Bryant and McCoy agreed to do it.  This testimony—which the jury credited—was sufficient to establish that Elder had the requisite knowledge that Bryant and McCoy would in fact use a gun in extorting Mahmoud Kasem.

Elder further argues that the Court should overturn the jury's verdict because the government did not prove that Elder confirmed with McCoy and Bryant that they had a gun and intended to use it in the extortion.  But the government was not required to prove that Elder did so.  The evidence established that Elder instructed Bryant and McCoy to use a gun to extort Mahmoud Kasem, and that Bryant and McCoy agreed to do so in exchange for $10,000.  That evidence is sufficient to prove that Elder had the requisite "advance knowledge" that his co-conspirators would use a gun to extort Mahmoud Kasem.  See United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993) ("A conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.").  Any alleged lack of corroboration

bears only on the weight of the evidence, not its sufficiency, and a challenge to the weight of the evidence is a matter for argument to the jury, not grounds for reversal post-conviction.  See id.

Bryant's attempt to argue that the evidence failed to show his advance knowledge is equally unavailing.  McCoy testified that after Elder offered them $10,000 to extort Mahmoud Kasem at gunpoint, McCoy and Bryant discussed how to get a gun.  Tr. 362. During that exchange, McCoy suggested asking Dwayne Ling, which McCoy ultimately did. Id.  After Ling and McCoy spoke, Bryant participated in a conversation with McCoy and Ling during which Ling agreed to participate and confirmed that he could bring a gun.  Tr. 365-66. As McCoy testified, Ling was part of the plan only because he could get a gun and, on the day of the murder, Bryant "knew why Ling was there,"  Tr. 371, and did not say anything when Ling pulled out the gun inside the store, Tr. 379.  That testimony alone is sufficient to establish Bryant's advance knowledge that a firearm would be used to extort Mahmoud Kasem.

What is more, as the Court correctly instructed the jury, Tr. 1563, advance knowledge "means knowledge at a time the accomplice can do something with it—most notably, opt to walk away."  United States v. Robinson, 799 F.3d 196, 200 (2d Cir. 2015) (internal quotation marks omitted) (quoting Rosemond v. United States, 572 U.S. 65, 78 (2014)).  Accordingly, "knowledge of the gun may, but does not have to, exist before the underlying crime is begun.  It is sufficient if the knowledge is gained in the midst of the underlying crime, as long as the individual continues to participate in the crime and has a realistic opportunity to withdraw."  Tr. 1563.

Here, the trial testimony and video surveillance from outside Garden Valley demonstrated that Bryant chose to continue in the extortion even after Ling pulled out the gun.

As detailed above, several witnesses testified that almost immediately after Bryant, McCoy and Ling entered Garden Valley, Ling pulled out the firearm.  Anjane Ramnath, a Garden Valley employee, testified that Ling was holding the gun "like he wanted to use it."  Tr. 277. Mahmoud Kasem, Rolando Mojica and Fred McCoy all testified that the gun was visible in Ling's hand.  Tr. 124, 255, 377.  After Ling pulled the gun out, and even after McCoy pistol-whipped Mahmoud Kasem, Bryant stayed at his post, blocking the exit.  Tr. 378.  In fact, Bryant attempted to stop Rolando Mojica, a Garden Valley employee, from running out of the store after Ling pulled out the gun.  Tr. 256-57.  He also instructed Anjane Ramnath, another store employee, not to touch her phone, again, after Ling pulled out the gun:

> A.    After Mahmoud and the other one got physical, they were fighting, the one in the middle with the gun, he walked up to them and he aimed at them twice.  He pointed towards them twice.
>
> Q.    What about the man at the door, what was he doing?
>
> A.    He was standing most of the time.
>
> Q.    At any point did he -- the man by the door, did he say anything to you?
>
> A.    Yes. I was about to touch my phone, and he said, don't do that.

Tr. 281.  Moreover, as is reflected on surveillance video from outside the store, McCoy left the store and Bryant and Ling nevertheless remained inside and struggled with Hani Kasem. Tr. 128, 282, 379.  Accordingly, even assuming that the evidence was insufficient to show that Bryant knew Ling brought a gun to the extortion (it was not), the evidence was still sufficient to establish Bryant's "advance knowledge" to sustain his conviction on this count.  See, e.g., United States v. Robinson, 799 F.3d 196, 201 (2d Cir. 2015) (evidence that defendant did not

24

abandon carjacking when co-conspirator pulled out a gun was sufficient to establish advance knowledge).

Finally, the defendants argue that the jury's guilty verdict on Count Ten should be vacated because there was insufficient proof of malice aforethought.  Elder Br. 1; Bryant Br. 8-12.  Although the defendants cast this argument as relating to the sufficiency of the evidence, that is actually window dressing on legal arguments they already raised and lost in their pretrial motions.  Specifically, the defendants argue that their convictions for threatening and committing physical violence in furtherance of an extortion cannot serve as the underlying felony for their Section 924(j) convictions.  See Elder Br. 1; Bryant Br. 9-11.  The Court has already rejected this argument and should do so again. Tr. 1260.  Title 18, United States Code, Section 924(j)(1) provides, in relevant part, that "[a] person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall if the killing is a murder (as defined in section 1111)," be punished.  Title 18, United States Code, Section 1111(a), in turn, defines "murder" as "the unlawful killing of a human being with malice aforethought."  As explained in detail in the government's opposition to the defendants' pretrial motions, see ECF No. 286 at 14, "'malice aforethought' within the meaning of 18 U.S.C. § 1111 may be found from the intent to commit a felony."  United States v. Regnier, 44 F. App'x 524, 528 (2d Cir. 2002) (summary order).  In other words, the commission of any felony constitutes "malice aforethought" under Section 1111(a).  And so if an unlawful killing results during the commission of any felony, it is murder – either first degree if it is one of the specified offenses, or second degree, which encompasses "[a]ny other murder."  See United States v. Pearson, 159 F.3d 480, 486 (2d Cir. 1998) (explaining that "second degree murder's malice aforethought element is satisfied by," among other things, "commission of a felony

when the felony in question is not one of those specified in the first degree murder paragraph of § 1111(a)"). Accordingly, the defendants' convictions on Count Ten for causing the death of Hani Kasem through use of a firearm are properly supported by their convictions for threatening and committing physical violence in furtherance of the extortion of Mahmoud and Hani Kasem on a felony-murder theory.[8]

At bottom, the defendants ask this Court to substitute their own views of the evidence for that of the jury's. The defendants' post-trial claims—that they did not know that there would be a gun—are simply arguments or competing inferences about the evidence that the jury was free to consider and reject. See, e.g., United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008) (holding that court "must defer to the jury's choice" about which inferences to draw because "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence" (citations and internal quotation marks omitted)). That the jury chose not to believe the defendants' arguments or version of the events does not warrant reversing the jury's verdict or granting a new trial. The defendants' motion for a judgment of acquittal on these bases should therefore be denied.

---

[8] To the extent the defendants do challenge the sufficiency of the evidence on their convictions for threatening and committing physical violence in furtherance of an extortion, the Court should reject that argument. As detailed at length herein, the evidence admitted at trial well establishes that the defendants are guilty of that count.

II.     The Court's Decision to Impanel Only Vaccinated Jurors Complied with the JSSA and
        the Constitution

        The defendants move for a new trial under Rule 33 "based on the Court's
determination to seat only jurors who were vaccinated against COVID-19."  Bryant Br. 13.
As explained in the government's pretrial submissions, the Court acted well within its broad
discretion under the JSSA in determining to seat only vaccinated jurors.  Moreover, the
defendants have not demonstrated that their Fifth or Sixth Amendment rights were violated by
that decision, nor could they.

        A.     Rule 33

        Ordering a new trial under Rule 33 is an extraordinary remedy that is
"disfavored in this Circuit," and, as a result, "the standard for granting such a motion is strict."
United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995).  Rule 33 permits a court, upon
motion by the defendant, to "vacate any judgment and grant a new trial if the interest of justice
so requires."  Fed. R. Crim. P. 33(a).  However, the defendant bears the burden of proving that
he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule
33."  United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009).

        B.     The Vaccination Status of the Jurors Did Not Violate the Defendants' Rights

        As the government explained in detail in its pretrial submissions, which the
government incorporates by reference, the defendants' arguments that the Court's decision to
empanel only vaccinated jurors violated the JSSA and the Fifth and Sixth Amendments are
meritless.

        First, the Court's decision to empanel only vaccinated jurors was a proper
exercise of its discretion under the JSSA.  Under that statute, "any person summoned for jury

service maybe (1) excused by the court . . . upon a showing of undue hardship or extreme inconvenience," after which the person may be considered for jury service in another case, or "(2) excluded by the court on the ground that . . . his service as a juror would be likely to disrupt the proceedings."  28 U.S.C. § 1866(c).  A prospective juror may be excused because of "undue hardship" under 28 U.S.C. § 1866(c)(1) for "generic hardship excusals."  United States v. Spriggs, 102 F.3d 1245, 1253 (D.C. Cir. 1996) (per curiam).  In addition, exclusion because of a risk of "disrupt[ing] the proceedings" under § 1866(c)(2) "encompass[es] both the generic and case-specific" risk.  Id.

A district court's decision to excuse a prospective juror under 28 U.S.C. § 1866(c) is reviewed for an abuse of discretion, and even if the court errs, relief is only warranted if there has been "a substantial failure to comply with the provisions [of the JSSA]."  28 U.S.C. § 1867(d); see also United States v. Williams, 927 F.2d 95, 97 (2d Cir. 1991) (affirming conviction where jury clerk excused two jurors on hardship grounds before they were questioned by the court, stating, "even if the excuse of the two jurors was error, it was harmless error"); cf. United States v. Contreras, 108 F.3d 1255, 1269-70 (10th Cir. 1997) (reviewing § 1866(c) exclusion for abuse of discretion and affirming conviction because any error was not "sufficiently egregious" to warrant a new trial).

As noted above, before jury selection began, the Court found that seating non-vaccinated jurors was likely to disrupt the proceedings and constitute an undue hardship to them.  In particular, the Court found that the trial's length, complexity, and number of necessary persons to be present in the courtroom increased the risk that non-vaccinated jurors would contract and spread COVID-19.  See ECF No. 328.  It also found that, at the time of the trial, the New York City metropolitan area had a high incidence of COVID-19.  See id.  The

Court additionally found that, consistent with the findings of the Centers for Disease Control and Prevention, vaccines are effective at, among other things, preventing the incidence and spread of the disease. See id. Accordingly, the factual record amply supported the Court's determinations that seating non-vaccinated jurors in this case would create an undue risk that they could contract and/or transmit the disease and "disrupt the proceedings" by, among other things, causing delays for necessary isolation, removal of jurors or other participants in the trial, and endangering the physical well-being of both the non-vaccinated jurors and everyone else in the courtroom. Indeed, courts have upheld the exclusion of prospective jurors as potentially "disrupting" the proceedings for far less. See, e.g., United States v. McBrown, 149 F.3d 1176 (5th Cir. 1998) (upholding exclusion of a prospective juror who, contrary to the court's instructions, wore inappropriate clothing such as "long shorts" and "sneakers," holding that the district court did not abuse its discretion in finding the juror was likely to "disrupt the proceedings" under 28 U.S.C. § 1866(c)(2)).

   The defendants' arguments that their Fifth and Sixth Amendment rights were violated are equally meritless. As an initial matter, statistics cited by the government before jury selection showed that the vaccination rates within the Eastern District of New York were not as racially disparate as the defendants urge. See "COVID-19: Data," N.Y.C. Health, available at https://www1.nyc.gov/site/doh/covid/covid-19-data-vaccines.page#nyc (last visited Sept. 11, 2021) (reporting the following percentages of fully vaccinated residents: (a) Brooklyn – 36% of Blacks, 46% of Hispanics, and 41% of Whites; (b) Queens – 35% of

Blacks, 57% of Hispanics, and 46% of Whites; and (c) Staten Island – 36% of Blacks, 43% of

Hispanics, 44% of Whites).  In any event, both constitutional claims fail.

With regard to the Fifth Amendment, "[t]o raise a plausible equal protection

challenge against a jury selection system, the defendant must show (1) a cognizable group;

(2) that is substantially underrepresented; and (3) that the selection procedure is not racially

neutral."  United States v. Schulte, No. S3 17 CR. 548 (PAC), 2021 WL 1146094, at *3

(S.D.N.Y. Mar. 24, 2021).  Substantial underrepresentation for purposes of the Fifth

Amendment "must be proved, by comparing the proportion of the group in the total population

to the proportion called to serve as . . . jurors, over a significant period of time."  Castaneda v.

Partida, 430 U.S. 482, 494 (1977).  In addition, "an equal protection claim must allege

intentional discrimination by the jury selection system at issue."  Schulte, 2021 WL 1146094,

at *3; accord, e.g., Alston v. Manson, 791 F.2d 255, 257 (2d Cir. 1986).

Here,  the defendants have not even attempted to show that any cognizable group

was, in fact, underrepresented in the panel of qualified jurors, and their claim fails on that

ground alone.  Moreover, as detailed above, the Court's decision to empanel only vaccinated

jurors was not the product of any intentional discrimination.  The defendants do not contend

otherwise, let alone attempt to cite any evidence of discriminatory intent.  See Schulte, 2021

WL 1146094, at *9 (rejecting equal protection claim where the defendant's "only contention

on this element [wa]s that the underrepresentation of African Americans and Hispanic

Americans 'cannot be the result of chance'").

As to the defendants' Sixth Amendment challenge, that amendment "requires

that jury panels be drawn from a source representing a 'fair cross section' of the community

in which the defendant is tried."  United States v. Jackman, 46 F.3d 1240, 1244 (2d Cir. 1996)

(citing Taylor v. Louisiana, 419 U.S. 522, 536 (1975)).  To establish a prima facie case on this claim, the defendants must show, among other things, "that the representation of [a distinctive] group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community."  Duren v. Missouri, 439 U.S. 357, 364 (1979). Importantly, the Sixth Amendment's "fair cross-section requirement applies only to the larger pool serving as the source of names and not to the petit jury.  In other words, the Sixth Amendment guarantees the opportunity for a representative jury venire, not a representative venire itself."  Id.  Thus, "[d]efendants are not entitled to a jury of any particular composition" under the Sixth Amendment.  Taylor, 419 U.S. at 538.

Here, the defendants do not allege that a "distinctive group" was underrepresented in the jury panel, let alone that any such underrepresentation was not "fair and reasonable in relation to the number of such persons in the community."  Instead, their unsupported allegations relate only to the composition of the petit jury.  Accordingly, the defendants' Sixth Amendment claim is meritless.

Finally, even if the defendants had established a prima facie case under either the Fifth Amendment or the Sixth Amendment, the burden would shift to the government to prove "attainment of a fair cross section to be incompatible with a significant state interest," Duren, 439 U.S. at 368 (Sixth Amendment), or that the underrepresentation of the identifiable group was not due to a "discriminatory purpose," Castaneda, 430 U.S. at 495 (Fifth Amendment).  As detailed above, the Court's decision to seat only jurors that were vaccinated against COVID-19 was based on its findings that seating non-vaccinated jurors was likely to disrupt the proceedings and constitute an undue hardship to them, including by endangering their health and safety, and the health and safety of others in the courtroom.  Accordingly, even

if the defendants had established a prima facie constitutional claim, any such claim would still fail.

For the reasons above, the Court should deny the defendants' motion for a new trial under Rule 33.

## CONCLUSION

For the reasons set forth above, the government respectfully submits that the Court should deny the defendants' post-trial motions for a judgment of acquittal or, alternatively, a new trial.

Dated:      Brooklyn, New York
            December 13, 2021

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:      _____/s/_____
         Genny Ngai
         Anna L. Karamigios
         Assistant United States Attorneys
         (718) 254-7000