UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,                    :
                                             :
            v.                               :        **MEMORANDUM & ORDER**
                                             :        18-CR-00092 (WFK)
Wilbert Bryant                               :
                                             :
                        Defendant.           :
-----------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On March 12, 2020, the United States of America filed a fourteen-count Superseding Indictment (the "Indictment") in this action charging Wilbert Bryant ("Defendant") with Counts Two, Seven, Eight, Nine, and Ten, and Ppassim Elder ("co-Defendant") with Counts One through Fourteen. *See* ECF No. 230. Beginning on September 20, 2021, this Court presided over the jury trial of Bryant and Elder. On October 1, 2021, the jury found Ppassim Elder guilty as to Counts One through Thirteen, and Wilbert Bryant guilty as to Counts Two, Seven, Eight, Nine, and Ten. The jury acquitted Defendant Elder on Count Fourteen. On November 9, 2022, this Court vacated the convictions for Counts Nine and Ten as to Defendants Elder and Bryant. For the reasons discussed below, Defendant is hereby sentenced to a term of 40 years of incarceration, 5 years of supervised release with special conditions, restitution in an amount to be determined, forfeiture in the amount of $12,800 , and a $300 mandatory special assessment.

**I.    Charges and Conviction**

On October 1, 2021, Defendants Ppassim Elder and Wilbert Bryant were convicted by a

jury which found beyond a reasonable doubt these two defendants guilty of (1) committing

physical violence in furtherance of extortion and extortion conspiracy against Mahmoud and Hani

Kasem, in violation of 18 U.S.C. § 1951(a) (Counts Seven and Eight); (2) using, brandishing,

discharging, and causing the death of Hani Kasem through the use of a firearm, in violation of 18

U.S.C. §§ 924(c)(1)(A)(i)–(iii) and 924(j)(1) (Counts Nine and Ten); and (3) conspiring to commit

bank fraud, in violation of 18 U.S.C. § 1349 (Count Two). The jury also found co-Defendant Elder

guilty of bank fraud conspiracy, in violation of 18 U.S.C. § 1349 (Counts One, Three, and Five);

committing physical violence in furtherance of an extortion against Mohammed and Ibrahim

1

Rabah, in violation of 18 U.S.C. § 1951(a) (Count Four); access device fraud, in violation of 18 U.S.C. §§ 1029(a)(1) and 1029(c)(1)(A)(i) (Count Six); conspiring to make false statements and making false statements, in violation of 18 U.S.C. §§ 371 and 100(a)(2) (Counts Eleven and Twelve); and aggravated identity theft, in violation of 18 U.S.C. § 1028a (Count Thirteen). The jury acquitted Elder on the charge of obstruction of justice (Count Fourteen).

On May 20, 2021, Elder filed a pretrial motion requesting, among other things, dismissal of Counts Nine and Ten of the Indictment, which are based on the crime charged in Count Eight. ECF No. 275. Specifically, Count Eight charges Defendant Elder and co-Defendant Bryant with knowingly and intentionally threatening to commit and committing physical violence against Mahmoud and Hani Kasem in furtherance of a plan to commit extortion, in violation of 18 U.S.C. § 1951(a). Counts Nine and Ten of the Superseding Indictment relate to the same conduct giving rise to Count Eight. Specifically, Count Nine charges co-Defendants Elder and Bryant with knowingly and intentionally using and carrying a firearm during and in relation to a crime of violence and possessing, brandishing, and discharging that firearm in furtherance of the crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)-(iii), and Count Ten charges Defendants with committing murder during that crime of violence in violation of 18 U.S.C. § 924(i)(l).

On August 25, 2021, this Court denied the motion at ECF No. 275. *See* ECF No. 316. On October 2, 2022, and October 12, 2022, Elder and Bryant filed motions for reconsideration of the Court's decision denying the motion. ECF Nos. 420, 424. On November 9, 2022, in light of the Supreme Court's decision in *United States v. Taylor*, 142 S. Ct. 2015 (2022) and the Second Circuit's decision in *United States v. Chappelle*, 41 F.4th 102 (2d Cir. 2022), and on consent of the parties, this Court granted the Defendants' motions and vacated Elder and Bryant's convictions for Counts Nine and Ten the following day. ECF. No. 435.

2

This Court hereby sentences the Mr. Bryant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## II.   Discussion

### a.  Background

The Federal Bureau of Investigation ("FBI") led the investigation into the instant offenses. The FBI's investigation revealed the assorted criminal conduct of co-Defendant Ppassim Elder, which included fraud and extortion schemes, as well as various acts of intimidation and violence, as outlined below.

#### i.  Fraud Schemes

Since at least 2012, co-Defendant Elder recruited individuals to commit various acts of bank fraud. These individuals, including both Defendant's co-Defendants and others, had—at co-Defendant Elder's direction—opened bank accounts in their names and gave the account information to co-Defendant Elder for his personal use. Presentence Investigation Report ("PSR") at ¶ ¶ 10-15, ECF No. 443. These accounts were used to commit various frauds totaling a loss amount of $387,660.35. *Id.* at ¶ 16.

The fraudulent schemes proceeded as follows: on Elder's behalf, Defendant and his co-conspirators convinced individuals across the country to deposit money into newly opened accounts listed in their names. *Id.* at ¶ 10. These individuals deposited these funds in exchange for goods and services promised but never provided. *Id.* at ¶ 10. The co-conspirator named on the account then withdrew the deposited funds in cash and delivered them to Elder. *Id.* at ¶ 18. Elder distributed a small percentage of this money to his co-conspirators as payment. *Id.* at ¶ 10.

In July 2012 and August 2012, Defendant opened an account at TD Bank in his name for Elder's use. *Id.* at ¶ 12. Defendant used his account to commit fraud against one individual, totaling a loss amount of $32,000. *Id.* at ¶ 12.

### ii. *Extortion of Mahmoud Kasem and Hani Kasem*

In July 2017, Elder recruited Defendant Frederick McCoy and Bryant into the extortion scheme Elder had begun in 2016. *Id.* at ¶ 30.

Mahmoud Kasem ran a business with his father Hani Kasem, called Garden Valley Distributors, which supplied local delis and bodegas. *Id.* at ¶ 20. In the Fall of 2016, Mahmoud Kasem wanted to expand the business but was unable to secure funding from his bank. *Id.* at ¶ 20. Elder approached Mahmoud Kasem and offered to meet him at the Garden Valley store in Ozone Park. *Id.* at ¶ 20. Over the course of subsequent meetings, Elder offered to invest in Garden Valley. Mahmoud Kasem accepted this offer. *Id.* at ¶ 21. Elder then persuaded Mahmoud Kasem to take checks from Elder and cash them. *Id.* at ¶ 21. Elder thereafter asked Mahmoud Kasem to withdraw the money from the account in cash and return it to him. *Id.* at ¶ 21.

Mahmoud Kasem deposited two checks into the Garden Valley account. *Id.* at ¶ 22. These checks, which were issued by Sajahtera Inc. and funded by Elder's fraudulent schemes, totaled $85,000.00. *Id.* at ¶ 22. After Mahmoud Kasem deposited the checks, Elder did as he said and, at various times, directed Mahmoud Kasem to withdraw the cash and give it to him. *Id.* at ¶ 22.

In February 2017, Elder asked Mahmoud Kasem to let him use the Garden Valley account to send a wire transfer, and Mahmoud Kasem agreed. *Id.* at ¶ 23. Elder brought $100,000 in cash to the Garden Valley store, and he and Mahmoud Kasem went to the local TD Bank. *Id.* at ¶ 23. After arriving at the bank, Mahmoud Kasem returned home to retrieve another form of

4

identification. By the time Mahmoud Kasem returned to the bank, the cash had been deposited into the Garden Valley account and sent via wire transfer to another company at Elder's direction. *Id.* at ¶ 23.

In March 2017, Elder asked Mahmoud Kasem to again deposit cash into the Garden Valley account and wire it for Elder's use. *Id.* at ¶ 24. This time the amount to be deposited was $150,000. *Id.* at ¶ 24. Mahmoud refused. He had become suspicious of Elder's transactions. *Id.* at ¶ 24. Mahmoud Kasem's accountant also indicated continued deposits of this nature could cause trouble with the Internal Revenue Service ("IRS"). *Id.* at ¶ 24.

Subsequently, Mahmoud Kasem asked Elder to sign a document stating the cash and checks deposited into the Garden Valley account belonged to Elder. *Id.* at ¶ 25. Elder refused. *Id.* at ¶ 25. Instead, Elder demanded Mahmoud Kasem repay the amount of money remaining in the Garden Valley account from the deposited checks, which approximated $40,000. *Id.* at ¶ 25. Mahmoud Kasem could not repay this money all at once but offered to make payments in smaller increments. *Id.* at ¶ 25. Elder again refused and demanded an immediate return of the funds in one lump sum. *Id.* at ¶ 25.

Elder proceeded to threaten Mahmoud Kasem with physical violence to induce this repayment. *Id.* at ¶ 26. Elder threatened to shoot Mahmoud Kasem in the leg and to send "blacks" and "Hispanics" after him. *Id.* at ¶ 26. He also hired individuals to throw rocks at the Kasem family home. *Id.* at ¶ 26. In April 2017, individuals drove to the Kasem family home, and, when Mahmoud Kasem saw one of these men with a rock in his hand, he proceeded to chase after him. *Id.* at ¶ 26. This individual later told Mahmoud Kasem Elder had hired him to do this and to physically assault Mahmoud Kasem, which the individual ultimately did not do. *Id.* at ¶ 26.

5

On another occasion, using a large rock, an individual shattered the windshield of the vehicle of Mahmoud Kasem's cousin while it was parked in the Kasems' driveway. *Id.* at ¶ 35.

On yet another occasion, Elder and a different individual went to the Kasem home, unannounced and without permission, and began yelling for Mahmoud Kasem, who was not home. *Id.* at ¶ 28. However, Mahmoud Kasem's father, Hani Kasem, was home and eventually came downstairs to speak with Elder and his accomplice. *Id.* at ¶ 28. Thereafter, while attending a wedding in October 2017 at which Hani Kasem and his wife Fozieh were present, Elder proceeded to threatened Hani Kasem, stating, "I'm going to do my job now." *Id.* at ¶ 29.

### iii.  *Murder of Hani Kasem*

In approximately July 2017, Elder recruited Bryant and McCoy to extort the Kasems. *Id.* at ¶ 30. Elder had met McCoy in 2011 when they were incarcerated together on Rikers Island. *Id.* at ¶ 30. Defendant had met McCoy in 1992, when they participated in a drug treatment program together following their respective releases from prison. *Id.* at ¶ 30. The Defendant subsequently met Elder through McCoy, who had introduced the two for the purposes of committing bank fraud. *Id.* at ¶ 30.

With respect to the Kasems, Elder offered Bryant and McCoy $10,000.00, $5,000 each, to help him collect the money he claimed Mahmoud Kasem owed him. *Id.* at ¶ 31. Specifically, he directed Defendant and McCoy to threaten Mahmoud Kasem, and recommended they bring a gun for intimidation purposes when doing so. *Id.* at ¶ 31.

Neither Bryant nor McCoy possessed or had access to a gun at the time. *Id.* at ¶ 32. So, in the weeks before the murder on October 23, 2017, Bryant and McCoy recruited co-Defendant Dwayne Ling. Ling subsequently obtained a firearm on the group's behalf. *Id.* at ¶ 32.

In furtherance of the Kasem extortion, Elder provided Bryant and McCoy with the address of Mahmoud Kasem's Garden Valley business. *Id.* at ¶ 33. Bryant and McCoy proceeded to survey the store and Mahmoud Kasem on several occasions. *Id.* at ¶ 33. In exchange, Elder paid them $500.00. *Id.* at 33. On October 23, 2017, Bryant, McCoy, and Ling drove to Garden Valley, found Mahmoud Kasem, Hani Kasem, and two other workers, Rolando Mojica and Anjane Ramnath, and confronted them . *Id.* at ¶ 34.

Once inside the store, McCoy approached Mahmoud Kasem and informed him they were there to collect Elder's money, together with Bryant. *Id.* at ¶ 34. After Mahmoud Kasem stated the matter did not concern them, McCoy took the firearm from Ling, who was holding it at his side, and pistol-whipped Mahmoud Kasem above his left eye, causing Mahmoud Kasem to bleed. *Id.* at ¶ 34. At the same time, Bryant directed Ramnath not to touch her phone. *Id.* at ¶ 34. Additionally, when Mojica attempted to run from the store, Bryant, standing by the door, tried to stop him from exiting. *Id.* at ¶ 34.

Mahmoud Kasem and co-Defendant McCoy struggled the gun and the magazine, which had been ejected from the pistol. *Id.* at ¶ 35. Co-Defendant Ling later picked up the gun and pointed it at Mahmoud Kasem. *Id.* at ¶ 35. At this point, co-Defendant McCoy had left the store and proceeded to walk back towards the group's vehicle. *Id.* at ¶ 35. Bryant and co-Defendant Ling were still in the store fighting with Hani Kasem, who was trying to keep them inside. *Id.* at ¶ 35. Co-Defendant Ling then took the gun and fired it into the face of Hani Kasem, killing him. *Id.* at ¶ 35.

When Bryant, McCoy, and Ling returned to the car,  Ling stated he did not mean to shoot anybody. *Id.* at ¶ 35.

In the days thereafter, McCoy and Ling traveled to Scranton, Pennsylvania to  avoid detection by law enforcement. *Id.* at ¶ 36.  McCoy also purchased fake identification in the event he was stopped by the police; he also destroyed his cell phone. *Id.* at ¶ 36.  Mr. Bryant went to Virginia. *Id.* at ¶ 36.

In March 2018, a warrant was issued for co-Defendant McCoy's arrest. *Id.* at ¶ 36.  Co-Defendant McCoy again fled to Scranton, Pennsylvania before he returned to the Eastern District of New York a few days later to turn himself in. *Id.* at ¶ 36.  Notably, he destroyed his fake identification prior to returning. *Id.* at ¶ 36.

### iv. *Obstruction of Justice*

The FBI attempted to arrest Bryant at his apartment on January 4, 2019. *Id.* at ¶ 46.  When the arrest team knocked on his door, Bryant refused to open it, requiring law enforcement to force entry into the apartment. *Id.* at ¶ 46.  Once the door was opened, law enforcement discovered Bryant in a shooting stance, and one agent fired his weapon, although missing the Defendant. *Id.* at ¶ 46.  As the arrest team retreated, Bryant barricaded himself in the apartment, leading the initial arrest team to call in the New York City Police Department's Emergency Service Unit ("ESU") for assistance. *Id.* at ¶ 46.  Despite repeated requests by the ESU team, Bryant still refused to open the door to his apartment and threatened these officers. *See* PSR ¶ 46; *see also* Government's Sentencing Memorandum ("Gov't Memo"), at 13-14, ECF No. 458; *id.* at Exhibit A (The FBI Report detailing the nature of the Defendant's arrest).

When the ESU team managed to make its way into the bedroom where Bryant had barricaded himself, Bryant lunged at one of the officers with a knife. *See* Gov't Memo at 13; PSR ¶ 47.  The ESU subsequently retreated from the bedroom and was ultimately able to subdue Defendant only by drilling a hole through the wall of the bedroom and by tasing him. PSR at ¶

8

47.  After officers removed Bryant from the floor, they saw he had left behind a knife.  Inside the apartment, agents also recovered, among other things, three knives, including one with a handle resembling a firearm.  PSR at ¶ 47; Gov't Memo at 13-14; *id.* at Exhibit A-I.

        b.  Legal Standard

18 U.S.C. § 3553 outlines the procedures for imposing a sentence in a criminal case.  A sentencing court must also consider the Sentencing Guidelines in addition to the seven factors listed in 18 U.S.C. § 3553(a) when making a sentencing decision.  While the Sentencing Guidelines are merely advisory,  *United States v. Booker*, 543 U.S. 220, 264 (2005), the Guidelines range is the "starting point and the initial benchmark" for a court evaluating a criminal sentence. *See also United States v. Kimbrough*, 552 U.S. 85 (2007);  *Gall v. United States*, 552 U.S. 38, 49 (2007).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Id* at 49.  In this regard, the Guidelines provide "the framework for sentencing" and "anchor… the district court's discretion."  *Molina-Martinez v. United States,* 136 S. Ct. 1338, 1346 (2016) (internal reference and quotation marks omitted).

However, if and when a district court imposes a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and …the specific reason for the imposition of a sentence different from that described" in the Guidelines.  18 U.S.C. § 3553(c)(2).  The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form."  *Id.*  "The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)."  *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.).

This Court has considered the applicable Guidelines range as well as the seven factors listed in Section 3553(a). *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). It now will address each in turn.

**III.   Analysis**

> a.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

>> i.  *Family and Personal Background*

The Defendant was born on February 11, 1964 to the marital union of Wilbert Lee Bryant and Otelia (née Birdsong) Bryant in Emporia, Virginia. *Id.* at ¶ 98. Defendant's parents separated when he was young and have both since passed away. *Id.* at ¶ 98.

Defendant has two living siblings. *Id.* at ¶ 100. Defendant's third sibling died as a young child. *Id.* at ¶ 100. Defendant also has one paternal half-sibling. *Id.* at ¶ 101. Defendant remains close to all three siblings. *Id.* at ¶ 101. He also has a maternal half-sibling. *Id.* at ¶ 101. However, the two have not spoken since 2019. *Id.* at ¶ 101.

Despite being born in Virginia, Defendant grew up in Brooklyn, New York. *Id.* at ¶ 102. His parents divorced when he was seven years old. *Id.* at ¶ 102. Defendant was raised in his mother's household under lower-economic circumstances. *Id.* at ¶ 102. He and his mother shared a good relationship. *Id.* at ¶ 102. However, Defendant reported some physical abuse as a child. *Id.* at ¶ 102.

Defendant never married. *Id.* at ¶ 103. He was romantically involved with Tanya Miller for several years, but the two ultimately split due to Ms. Miller's reported crack cocaine addition. *Id.* at ¶ 103. They share one child together, Ms. Kamisha Bryant. *Id.* at ¶ 103. Now an adult, Ms. Bryant lives and works in California. She and her father remain close. *Id.* at ¶ 103.

Defendant shares another child with Ms. Sabrina Francis, whom he dated for several months in 1988. *Id.* at ¶ 104. Defendant speaks to his now adult-daughter, Ms. Tasia Carabello approximately once per week. *Id.* at ¶ 104.

Following his relationship with Ms. Miller, Defendant began dating Angelina Jimenez from 1992 until 1996. *Id.* at ¶ 105. The two bore one child, a daughter named Kenya Bryant. *Id.* at ¶ 104. However, she sadly passed away in 2002 at the age of 8. *Id.* at ¶ 105.

In 1995, Defendant began a romantic relationship with Ms. Fabiola Bonny, which lasted until 2001. *Id.* at ¶ 105. Defendant and Ms. Bonny coparented their daughter, Shania Bryant, who is now an adult, living with her mother in Queens, New York. *Id.* at ¶ 106.

Defendant has been involved in a romantic relationship with Sherry Williams since 2014. *Id.* at ¶ 107. The two do not share any children together, and Ms. Williams remains supportive of Mr. Bryant. *Id.* at ¶ 107.

### ii. Educational and Employment History

Defendant dropped out of high school in the 10th grade to begin working and assisting his family financially. *Id.* at ¶ 119. In 1983, Defendant earned the equivalent of a high school diploma. While incarcerated for a previous offense, Defendant successfully completed several college courses from Marist College in Poughkeepsie, New York. *Id.* at ¶ 119. Defendant was later accepted into John Jay College of Criminal Justice in New York, New York, but he never completed his studies. *Id.* at ¶ 119.

Defendant was employed as a union laborer, specializing in drywall and tapers from 1996 until his arrest in 2019 for the instant offense. *Id.* at ¶ 120. Before holding this position, Defendant worked at various companies earning cash wages. *Id.* at ¶ 122. The only period of unemployment

Defendant reported was for a short time during 2012 when he had completed one job and was awaiting placement on another. *Id.* at ¶ 122.

### iii.  Prior Convictions

Defendant has been arrested twice before. *Id.* at ¶¶ 91-92.  On January 28, 1982, Defendant was arrested and subsequently convicted of Robbery in the 2nd Degree, a Class C Felony. *Id.* at ¶ 91.  On February 8, 1983, Defendant was sentenced to 18 to 54 months in custody in Kings County Supreme Court and was ultimately released after serving 27 months. *Id.* at ¶ 91.  On September 5, 1991, Defendant was arrested again for Attempted Robbery in the 3rd Degree, a Class E Felony. *Id.* at ¶ 92.  On May 28, 1992, a New York County Supreme Court sentenced the Defendant to a term of incarceration between 18 and 36 months. *Id.* at ¶ 92.  Defendant was released after serving a term just shy of 1.5 years. *Id.* at ¶ 92.

To this Court's knowledge, Defendant's 1992 arrest and subsequent conviction are his most recent to date, barring the instant matter.

### iv.  Medical and Mental Health

Defendant has struggled with various medical ailments for several years. *Id.* ¶¶. 111-115. He has a history of tuberculosis, emphysema, remote granulomatous disease, and prostate cancer. *See* Defendant's Motion to Continue Sentencing at 1, ECF No. 457.  He also suffers from sarcoidosis on his lungs, which causes inflammation throughout his body, in addition to a Vitamin D deficiency, high cholesterol, high potassium levels, and a cyst on his kidney. *See* PSR at ¶¶ 111-115.

Defendant's cancer is perhaps his most serious medical condition.  His battle with this disease began in 2015 when he was diagnosed with an early stage of prostate cancer. *Id.* at ¶ 111. Aside from taking some medication and receiving periodic biopsies, Defendant did not receive

any treatment for this condition until February 2022, after he was hospitalized due to complications with urination. *Id.* at ¶ 111. Defendant has since had a catheter put in place and has received updated biopsies to monitor his condition. *Id.* ¶ 111. However, it now appears that Defendant's cancer has worsened. *See* Defendant's Motion to Continue Sentencing at 1.

According to a letter from his Defense Counsel dated February 1, 2023, it now appears, based on a series of CT scans, PET scans, and biopsies undertaken at the Metropolitan Detention Center, Defendant may have bone and lung cancer. *Id.* at 1. *See also* Defendant's Sentencing Memorandum Supplement ("Def. Memo Exhibit A"), ECF No. 456. Defendant awaits a prognosis. *See* Defendant's Motion to Continue Sentencing at 1.

Defendant not only struggles physically but also mentally. Defendant attempted suicide at the age of 17. PSR at ¶ 116. He slit his wrist in a reported attempt to receive more love and attention from his father. *Id.* at ¶ 116. He was found by a relative shortly thereafter and promptly taken to the hospital for treatment. *Id.* at ¶ 116. He was released that same day and never made any further attempts on his life. *Id.* at ¶ 116. Defendant stated he began experiencing suicidal thoughts during his present incarceration when COVID-19 lockdowns ensued. Although, he remarked these thoughts have since passed. *Id.* at ¶ 117.

### v.  Substance Abuse

In addition to battling various medical and mental conditions, Defendant also has a history of substance abuse, which began when Defendant was 16 years old. *Id.* at ¶ 118. As a teenager, the Defendant started smoking marijuana on a daily basis. *Id.* at ¶ 118. This is a habit, the Defense believes, Defendant picked up to "cope" with the trauma he faced as a teenager growing up around violence and crime. Defendant's Sentencing Memorandum ("Def. Memo") at 4-5, ECF No. 455.

Defendant's drug use continued into his 20s when he was incarcerated. *Id.* at ¶ 118. When Defendant was released to parole, Defendant began smoking again. *Id.* at ¶ 118. This time, however, Defendant opted for marijuana laced with crack cocaine. *Id.* at ¶ 118. Defendant continued smoking marijuana and crack on a daily basis from approximately 1985 until 1990. While Defendant showed a preference for these two drugs, he also occasionally used lysergic acid diethylamide, otherwise known as "LSD," and powder cocaine. *Id.* at ¶ 118.

These drugs are serious. Yet, despite using them regularly, Defendant claimed they never impacted his ability to work. *Id.* at ¶ 118. In this regard, Defendant described himself as a "functional addict." *Id.* at ¶ 118. Defendant never reported any problematic alcohol use. *Id.* at ¶ 118. Moreover, while on parole, Defendant successfully completed a court-ordered substance abuse treatment program at New Directions in Brooklyn, New York. *Id.* at ¶ 118.

### vi.   *Nature and Circumstances of the Offense*

The Court's previous analysis addresses the nature and circumstances surrounding the instant offense. *See supra* at Sections II(a)(i)-(iv).

### b.   The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Defense raises several points in support of the proposition that a sentence of no more than ten years of imprisonment is "sufficient, but not greater than necessary," within the meaning of 18 U.S.C. § 3553(a).  Def. Memo at 18.  It cites as relevant: (1) Defendant's lack of guidance as a youth and similar circumstances; (2) his race; (3) his socioeconomic status; (4) his poor health; (5) his age; (6) his employment history; (7) his familial support and obligations; (8) the harsh conditions of his detention; (9) and the need to avoid sentence disparities.  *Id.* at 18.

The Defense argues the Court should consider the harsh conditions of the Defendant's childhood, the challenges he faced growing up in a poor segregated community in Brooklyn, and the impact this likely had in steering the course of Defendant's life.  *Id.* at 19.  This is noted. The Defense also asks this Court to consider Defendant's health and medical needs.  *Id.* at 20. This, too, is taken into consideration.  The Defense then urges the Court to consider the fact Defendant has successfully pursued his education and has held employment consistently throughout his adult life.  *Id.* at 21.  The Defense also notes the success Defendant has had in addressing his substance abuse issues.  *Id.* at 21.  Defendant's efforts here should be applauded. The Defense also draws to the Court's attention the impact Defendant's sentence will have on Defendant's family.  This, too, is noted as well.

The Court does not take any of the considerations raised by the Defense for granted; it has considered each of them with care.  Still, this Court cannot overlook the grievous nature of this offense; nor can it ignore the voices of the Defendant's victims, who continue to suffer, and who will mourn their loved one for the rest of their lives.  *See* Gov't Memo at 34 (referencing the Victim Impact Statement). This Court has heard from the family of Defendant's victims; it knows of the heartache, loss, and struggle the Kasem family, in particular, has been through.  *See* Victim Impact Statement.  It understands the lives of those in the Kasem family will never be the same—

15

their rock was stolen from them by the hands of this Defendant, and their joy and happiness were taken along with it. *Id.* This Court cannot and does not overlook this.

This Court's sentence reflects the seriousness of the instant offense and the role Defendant played in carrying out the conspiracy's ends. This Court's sentence strives to promote respect for the law, and it aims to achieve just punishment for the crimes of conviction. Not only that, this Court's sentence aims to deter this Defendant from committing future crimes, and to protect the public at large. In sentencing this Defendant, this Court also hopes to provide this Defendant with the treatment he needs, not only to overcome his present health struggles, but also to change the course of his life.

### c. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

On Count Two, the maximum term of imprisonment is 30 years on each count. 18 U.S.C. §§ 1344 and 1349. On Counts Seven and Eight, the maximum term of imprisonment is 20 years on each count. 18 U.S.C. § 1951(a).

On Count Two, the Court may impose a term of supervised release of not more than five years. 18 U.S.C. § 3583(b)(1). On Counts Seven and Eight, the Court may impose a term of supervised release of not more than three years on each count. 18 U.S.C. § 3583(b)(2). Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

On Count Two, a Class B Felony, Defendant is ineligible for probation, and he will be sentenced at the same time to a term of imprisonment for the same or a different offense. 18 U.S.C. § 3561(a)(1) and (3). On Counts Seven and Eight, Defendant is ineligible for probation because

he will be sentenced at the same time to a term of imprisonment for the same or a different offense. 18 U.S.C. § 3561(c)(1).

On Count Two, the maximum fine is $1,000,000. 18 U.S.C. § 3571(b). On Counts Seven and Eight, the maximum fine is $250,000 on each count. 18 U.S.C. § 3571(b). There is a $100 mandatory special assessment on each Count, totaling in $300. 18 U.S.C. § 3013. In determining whether to impose a fine—and the amount of such fine—this Court considers, among other factors, the expected costs to the government of any term of probation, or term of imprisonment, and term of supervised release imposed. 18 U.S.C. § 3572(a)(6). *See also* USSG §5E1.2(d)(7).

As detailed in the Indictment, the Government may seek forfeiture in accordance with 18 §§ U.S.C. 982(a)(2), 982(b)(1), 981(a)(1)(C), 982(a)(2)(B), 982(b)(1), 1029(c)(1)(C), 1029(c)(2), 924(d)(1), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p). *See* Indictment at ¶¶ 16-21.

Pursuant to 18 U.S.C. § 3663A, restitution is mandatory. However, the appropriate amount of restitution is not determinable yet as the Court is still awaiting responses from Defendant's victims and his victims' families. *See* PSR at ¶ 146.

The Court reserves its right pursuant to 18 U.S.C. § 3664(d)(5) to hold an evidentiary hearing within 90 days after this sentencing to determine the specific amounts owed to Defendant's victims.

### d. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for…the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

17

i.   Probation's Guidelines Calculation

Probation calculates Defendant has a total combined adjusted offense level of 43, PSR at ¶ 117, and a total criminal history score of 0, *id.* at ¶126, which results in a criminal history category of I, *id.* at ¶ 127.   Probation calculates this based on the following:

1.   Total Adjusted Offense Level

a.   Counts Seven and Eight

Count Seven charges Extortion Conspiracy, specifically with respect to the extortion of Mahmoud Kasem and Hani Kasem.   Pursuant to USSG §1B1.2(d), when a count charges a conspiracy to commit more than one offense, it shall be treated as if the defendant was convicted on a separate count of conspiracy for each offense.   *Id.* at ¶ 52.   Therefore, the calculations in this case must be done separately with respect to the conspiracy to extort Mahmoud Kasem and the conspiracy to extort Hani Kasem.   *Id.* at ¶ 52.   The conspiracy involving the former is herein referenced as Count 7(a) and the conspiracy involving the latter is herein referenced as Count 7(b).

Count Eight charges Committing Physical Violence in Furtherance of an Extortion, specifically with respect to the extortion of Mahmoud Kasem (Count 7(a)) and Hani Kasem (Count 7(b)).   *Id.* at ¶ 52.   This Count is grouped with Counts 7(a) and 7(b) per USSG §3D1.2(b), since these Counts involve the same victims, and acts connected by a common criminal objective, namely the extortion of the Kasems.   *Id.* at ¶ 52.   The Guidelines do not provide a mechanism by which to divide Count Eight, so for calculation purposes it is grouped with Count 7(a) to address the violence committed in relation to Mahmoud Kasem.   *Id.* at ¶ 52.

The applicable guideline for Counts 7(a) and 8 is USSG §2B3.2, and the base offense level is 18, per USSG §2B3.2.   A two-level enhancement is warranted per USSG §2B3.2(b)(1) because

18

the victim, Mahmoud Kasem, was expressly threatened with bodily injury.  *Id.* at ¶ 52.  A one-level enhancement is warranted per USSG §2B3.2(b)(2), by reference to USSG §2B3.1(b)(7)(B), because the amount of money demanded from Mahmoud Kasem was $40,000.00.  *Id.* at ¶ 52.  A six-level enhancement is warranted per USSG §2B3.2(b)(3)(A)(ii) because a firearm was otherwise used in relation to Mahmoud Kasem, in that Mahmoud Kasem was pistol-whipped by Defendant's co-conspirators.  *Id.* at ¶ 52.  A two-level enhancement is warranted per USSG §2B3.2(b)(4)(A) because the pistol-whipping is considered to have resulted in bodily injury.  *Id.* at ¶ 52.  Finally, and as previously detailed, an additional two-level enhancement is warranted per USSG §3C1.2 because Defendant created a substantial risk of serious bodily injury to others in the course of resisting arrest.  *Id.* at ¶¶ 52, 67.

The applicable guideline for Count 7(b) is USSG §2B3.2, which by way of the cross reference found at USSG §2B3.2(c), directs the use of USSG §2A1.1 if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111.  *Id.* at ¶ 53.  This provides a base level offense of 43.  Finally, and as previously detailed, an additional two-level enhancement is warranted per USSG §3C1.2 because Defendant created a substantial risk of serious bodily injury to others in the course of resisting arrest.  *Id.* at ¶¶ 53, 74.

For Counts 7(a) and 8, the base offense level (+18) plus these enhancements (+13) result in an adjusted offense subtotal of 31.  *Id.* at ¶ 68.  For Count 7(b) the base offense level (+43) plus these enhancements (+2) result in an adjusted offense subtotal of 45.  *Id.* at ¶ 75.

### b.  Count Two

Count Two charges Conspiracy to Commit Bank Fraud.  The applicable guideline for Count Two is USSG §2X1.1, which directs the base offense level from the guideline for the substantive offense be applied, plus any specific offense level characteristics for the intended

conduct that can be established with reasonable certainty. *Id.* at ¶ 51. The guideline for the underlying offense—the bank fraud—is USSG §2B1.1. *Id.* at ¶ 51.

For Count Two, the base offense level is 7 per USSG §2B1.1(a)(1) since the offense is referenced to this guideline and the statutory maximum term of imprisonment is 20 years or more. *Id.* at ¶ 51. Defendant is accountable for the total loss resulting from the bank fraud schemes he was directly involved in; he is not accountable for the other schemes in which co-Defendant Elder partook with fellow co-conspirators because these fraudulent schemes were not part of the jointly undertaken criminal activity Defendant agreed to and they were not reasonably foreseeable to this Defendant. *Id.* at ¶ 51. Since the total loss resulting from Defendant's bank fraud amounted to $32,000.00, as detailed above, a four-level enhancement is applied per USSG §2B1.1(b)(1)(G). *Id.* at ¶ 51. Finally, and as previously detailed, an additional two-level enhancement is warranted per USSG §3C1.2 because Defendant created a substantial risk of serious bodily injury to others in the course of resisting arrest. *Id.* at ¶¶ 53, 80.

For Count Two, the base offense level (+7) plus these enhancements (+6) results in an adjusted offense subtotal of 13. *Id.* at ¶ 81.

### 1. Combined Total Adjusted Offense Level

Where there are multiple count adjustments to consider, units are assigned pursuant to USSG §3D1.4(a), (b) and (c). *Id.* at ¶ 83. One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. *Id.* at ¶ 83. One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. *Id.* at ¶ 83. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

In the instant case, Counts 7(a) and 8 constitute Count Group 1, and Count 7(b) and Count Two stand alone. Count 7(b) represents the highest offense level at 45. *Id.* at ¶ 83. Therefore, the combined adjusted offense level is 45. *Id.* at ¶ 86. However, pursuant to Chapter 5, Part A (comment n.2), when the total offense level exceeds 43, the offense level will be treated as a level 43. *Id.* at ¶ 89.

Therefore, Defendant has a total combined adjusted offense level of 43. *Id.* at ¶ 89

### 2. Criminal History Score

In addition to calculating a total combined adjusted offense level of 43, Probation also calculated a criminal history score of zero and a criminal history category of I. *Id.* at ¶ 93.

As previously stated, Defendant was arrested and convicted twice before committing the instant offense. *Id.* at ¶¶ 91-92. Pursuant to USSG § 4A1.2(e)(3), neither of these convictions resulted in points for the purpose of calculating a criminal history score and a related criminal history category. *Id.* at ¶¶ 91-92

Altogether, Probation calculates Defendant has a total adjusted offense level of 43 and a criminal history category of I, which together, result in a recommended Guidelines term of life imprisonment. *Id.* at ¶ 133.[1]

### ii. Defense's Guidelines Calculation

### 1. Total Adjusted Offense Level

The Defense's calculation differs from Probation's. The Defense calculates a total combined adjusted offense level of 25 and a total criminal history score of 0, resulting in a criminal history category of I. Def. Memo at 17.

---

[1] Note: none of the offense convictions carry a maximum sentence of life. However, the Guidelines direct the Court to effectively impose an life sentence by sentencing the Defendant to consecutive terms on multiple counts of convictions.

The Defense set forth its objections to the calculations in Defendant's PSR by letter at ECF Nos. 451 and 454. As stated in their Sentencing Memorandum, the Defense also incorporates by reference the objections raised by co-Defendant Elder regarding the inapplicability of U.S.S.G. § 2B3.2(b)(1) (Threatened with Bodily Injury) and U.S.S.G. § 2A1.1 (First Degree Murder). *See id.* at 10 (referencing ECF No. 453).

Specifically, the Defense objects to and proposes the following, beginning with its objections:

The Defense objects to the two-level obstruction of justice enhancement Probation applied on all offensive conduct. *Id.* at 2 (referencing PSR ¶¶ 46-47, 50, 52, 53, 56, 67, 74, and 80).

On Probation's calculations regarding Count Two, the Defense's calculation only differs from Probation's with respect to the enhancement accounting for Defendant's alleged obstruction of justice. *Id.* at 2. Therefore, the Defense finds pursuant to USSG § 2X1.1(a), which directs the application of USSG §2B1.1, a base offense level of 7, per USSG §2B1.1(a)(1), combined with a four-level enhancement, per USSG. §2B1.1(b)(1)(C), leading to a total adjusted offense level of 11. *Id.* at 2.

On Probation's calculations regarding Counts Seven and Eight, *see* PSR at ¶¶ 59-75, the Defense challenges (1) the decision to calculate the extortion conspiracy as two separate "groups" for Guidelines purposes, that is as groups 7(a) and 7(b); (2) the enhancement for Count 7(b) taking into account the threat of bodily injury and the cross-reference to USSG § 2A1.1, which concerns first degree murder, provided by USSG § 2B3.2(c)(2). *See* Defendant's Sentencing Calculation Letter, ("Def. Ltr. 1") at 2-3, ECF. No. 451.

Were both these objections sustained, the Defense initially calculated an adjusted offense level for Counts Seven and Eight of 36. *Id.* at 4. (finding "[t]he applicable guideline for Counts

Seven and Eight is U.S.S.G. §2B3.2. U.S.S.G. §2B3.2(c) directs the use of USSG §2A1.1 if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111. As argued, because Hani Kasem's death was unintentional, lacking "malice aforethought," 18 U.S.C. § 1111 treats such acts as second degree murder, and the guideline for second degree murder is U.S.S.G. § 2A1.2, which provides for an adjusted offense level of 38, then with a 2 level reduction per U.S.S.G. § 3B1.2(b), the total offense level is 36."). However, upon further review and in light of co-Defendant Elder's Sentencing Memorandum, ECF. No. 453, the Defense further reduced its calculation for Counts Seven and Eight, to a total adjusted offense level of 25. *See* Defendant's Second Sentencing Calculation Letter, ("Def. Ltr. 2") at 1, ECF. No. 454 (finding "a base offense level of 18 per 18 U.S.S.G. §2B3.2, plus 1 level, per U.S.S.G. §2B3.2(b)(2), by reference to U.S.S.G. §2B3.1(b)(7)(B), plus 6 levels per U.S.S.G. §2B3.2(b)(3)(A)(ii), plus 2 levels per U.S.S.G. §2B3.2(b)(4)(A), and minus 2 levels per U.S.S.G.§ 3B1.2(b).").

Taken together, the Defense's proposed modifications result in a total adjusted offense level of 25. Def. Memo at 17. A total offense level of 25 taken in conjunction with a criminal history category of I leads to a recommended Guidelines range of 57 to 71 months. *Id.* at 17.

### iii. The Government's Calculation

The Government agrees with the Guidelines calculations set forth in the PSR. Government's Sentencing Memorandum ("Gov't Memo"), at 17, ECF No. 458. Before addressing the defendants' joint objections and this Defendant's individual objections, the Government's Memo notes as an initial matter that "[t]he Court need not resolve these Guidelines disputes if they would not affect the Court's ultimate sentence." *See* Government Sentencing Memorandum Gov't Memo at 21 (citing See Fed. R. Crim. Proc. 32(i)(3)(B) (stating that the court may decline to

resolve any sentencing dispute if it "determine[s] that a ruling is unnecessary…because the matter will not affect sentencing.")).

The Court agrees and declines to resolve any sentencing disputes not affecting sentencing. The Court addresses those disputes solely to demonstrate it has reviewed and considered them.

Now, with respect to the joint objections raised by Defendant and co-defendant Elder, the Government notes the following:

First, the PSR appropriately, in its view, considers Count Seven separately as to Hani Kasem and Mahmoud Kasem under U.S.S.G. § 1B1.2(d). First, Hani was not merely a bystander, but was the subject of the proven extortion. Therefore, the harm caused to him—his death—can be considered. *Id.* at 22. Counts Seven and Eight specifically alleged, and the jury found, Defendant and co-Defendant Bryant agreed to extort both Hani and Mahmoud Kasem. *Id.* at 22 (referencing Verdict Sheet, ECF No. 361 at 3). Therefore, the Government alleges, the record established at trial shows Hani was a victim of the proven extortion scheme. *Id.* at 22

In the alternative, the Government argues even if Hani were somehow a "bystander" and "not the subject" of the proven extortion, the Guidelines would nevertheless account for his murder under USSG § 2B3.2(c)(1), which directs the murder Guideline be applied "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111." *Id.* at 23. That is because the Second Circuit has made clear that a "victim" for purposes of this cross-reference includes "all persons killed to carry out the extortion scheme," and is not limited to "direct" victims of the extortion. *Id.* at 23 (referencing *United States v. Mulder*, 273 F.3d 91, 117-18 (2d Cir. 2001)). Accordingly, the Government maintains, even assuming Hani Kasem was not a direct victim of the scheme, he was killed during the commission of the extortion and therefore the murder Guideline applies. *Id.* at 23.

24

Second, the Government argues the PSR properly applies the cross-reference at USSG § 2B3.1(c)(1), which states: "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)." *Id.* at 23. In so saying, the Government rejects Bryant's claims that the Second Degree Murder Guideline, § 2A1.2, should apply on the grounds the text of the Guidelines is plainly clear that USSG § 2A1.1 shall apply. *Id.* at 23-24.

Third, the Government argues the two-level increase for threat of bodily injury relating to the offense level for the extortion of Mahmoud Kasem is appropriate. *Id.* at 24. The Government maintains the threat of bodily injury is not already incorporated into the base offense level for the offense of conviction. *Id.* at 25 (referencing Guideline § 2B3.2, application note 2 ("[I]f there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business.")). The Government also maintains neither the two-level increase for actual bodily injury nor the six-level increase for use a firearm, taken in conjunction with the increase for threat of bodily injury, is impermissibly duplicative; USSG § 2B3.2 accounts for each of these distinct harms with incremental offense level increases. *Id.* at 25.

With respect to this Defendant's individual objections, the Government states the following:

Regarding the argument that this Defendant should be granted a two-point reduction for having a minor role in the extortion offenses under U.S.S.G. § 3B1.2(b), the Government rejects this claim altogether. The Government notes to succeed on this argument the Defendant would have to prove by a preponderance of the evidence that his conduct was minor as compared to the

average participant, which, it believes, this Defendant has failed to do. *Id.* at 25-26 (citing *United States v. Carpenter,* 252 F.3d 230, 235 (2d Cir. 2001) (internal quotation marks omitted)). *See also United States v. Solis,* 18 F.4th 395,402 (2d Cir. 2021) (finding a role reduction "will not be available simply because the defendant played a lesser role than his co-conspirators." (quoting *Carpenter*, 252 F.3d at 235)). The Government references the trial record in support of this finding, noting Defendant had participated in the initial stages of the scheme months before the murder of Mr. Kasem; Defendant knew the full scope of the illicit agreement, including that a firearm would be used; Defendant had agreed to be compensated the same amount as co-Defendant McCoy; and Defendant was an active participant on the day of the murder. Gov't Memo at 26-27.

Regarding the argument that there is insufficient factual basis to apply the obstruction of justice enhancement under Guideline § 3C1.2 to this Defendant, the Government points to the reports attached to its Memorandum at Exhibits A-I, which, it believes, show by a preponderance of the evidence the series of events leading to Defendant's arrest and providing the basis of the obstruction adjustment. *Id.* at 27-29 ("[T]he attached photographs and reports are more than sufficient for the Court to make its necessary findings that Bryant "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer," which includes "in the course of resisting arrest." U.S.S.G. § 3C1.2, app. n.3.").

### 1. Criminal History Score

The Defense does not take issue with Defendant's criminal history score. The Defense agrees with Probation and the Government that Defendant's criminal history results in a criminal history score of 0 and thus a criminal history category of I. Def. Ltr. 1

iv.  Recommendations

1.  Probation

Based on its findings set forth in the PSR, the United States' Probation Department Recommends the following:

On Count Two, 5 years incarceration to run consecutive to all counts; on Count Seven, 10 years incarceration, to run consecutive to all counts; on Count Eight, 12 years incarceration, to run consecutive to all counts.  *See* U.S. Probation Department Sentence Recommendation ("Probation's Recommendation") at 1, ECF No. 443-1. Altogether, this recommendation amounts to a term of incarceration of 27 years.

Probation also recommends the following regarding supervised release: 3 Years Supervised Release on each count, all to run concurrently, with special conditions.  *Id.* at 1.

Probation expressly recognizes it is effectively proposing a life sentence considering Defendant's age and physical condition.  *Id.* at 3.  Still, Probation did not find any factors that would warrant a departure, or variance, from the recommended guidelines range, *id.* at 2, nor did Probation identify any factors that would warrant a sentence outside the advisory Guidelines system.  To the contrary, Probation believes a significant custodial sentence is warranted here as Defendant's involvement in the instant offense is serious and cannot be minimized.  *Id.* at 2. Probation also finds that such a sentence is needed to promote respect for the law, and more importantly, for human life.  *Id.* at 2.  Moreover, Probation finds a significant custodial term is necessary to promote principles of specific and general deterrence, and to provide just punishment. *Id.* at 2.

Probation also recommends a $300 mandatory special assessment, $100 per count.  *Id.* at 1.

### 2. Government

The Government believes an effective life sentence, one not less than 40 years, is warranted here given (1) the nature and circumstances of Defendant's offense, (2) the personal history of this Defendant, (3) the need for deterrence, both general and specific, and to protect the public, and (4) the Court's interest in promoting respect for the law.

First, the Government cites the serious nature of the instant offense, which cannot be overstated. *See* Gov't Memo at 33. Specifically with respect to the murder of Hani Kasem, the Government urges the Court to consider the unfathomable impact Defendant's actions have had on the Kasem family, whose members have spoken about this unimaginable tragedy, the impact it has had, and the likelihood that they will be in mourning for the rest of their lives. *Id.* at 34 (referencing the Victim Impact Statement the Government intends to file separately under seal). The Government also urges the Court not to overlook the impact Defendant conduct with respect to the conspiracy's fraud and extortion schemes have had on Defendant's victims. *Id.* at 34.

As to the Court's interest in specific deterrence, the Government notes Defendant's prior arrests, convictions, and subsequent terms of incarceration did little to sway this individual from committing further criminal acts. *Id.* at 39. Therefore, the Government argues, there is little reason to think that if the Defendant were released he would begin leading an upright life. *Id.* at 40.

Lastly, the Government urges the Court to consider the gravity of the instant offense, and to sway those who may consider committing similar offenses from engaging in this horrific course of conduct. *Id.* at 40. In the very least, the Government asks this Court to promote respect for the law, which Defendant has repeatedly failed to do. *Id.* at 40.

### 3. Defense

28

The Defense urges the Court to depart from the recommended guidelines range and to impose a non-guidelines sentence no less than 10 years. Def. Memo at 18. The Defense raises several arguments in support of this position, which this Court has addressed. *See supra* Section III(b).

This Court has also read and considered the numerous letters written by the Defendant's friends, loved ones, and family. *See* Letters Submitted on Behalf of the Defendant ("Def. Memo Exhibit B"), ECF No. 455-2. They talk about Defendant as a loving father, a caring friend, a hard worker, and a good man. *Id.* They urge the Court not to separate Defendant from his family any longer than need be, and not to overlook the fact Defendant was on the right path before getting involved with the wrong people and committing the instant offense. *Id.* The Court appreciates what Defendant's advocates have said on his behalf. This Court has carefully considered everything this Defendant's loved ones have had to say.

Indeed, this Court appreciates the sentencing arguments raised by all parties, and has considered each of these arguments in turn.

b. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement…issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

The Parties have not cited any relevant policy statements. Finding no other references to pertinent policy statements, this Court's analysis proceeds to the penultimate factor listed in Section 3553(a): the need to avoid unwarranted sentence disparities.

c. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The Defense argues the imposition of a sentence above 10 years would cause a sentencing disparity. Def. Memo at 29. In fact, the Defense goes as far as to state that such a sentence would effectively constitute a "trial penalty." *Id.* at 29. It makes this statement considering the fact the Government offered Defendant the opportunity to plea to a lesser sentence twice before his trial. *See* Def. Ltr. 1, Exhibit A. Had he done so, he would have faced either 135 to 168 months (pursuant to the Plea Agreement dated March 25, 2020) or 151 to 188 months (pursuant to the Plea Agreement dated September 3, 2021). Therefore, according to the Defense, to impose a substantially greater sentence is, in effect, to impose a penalty for rejecting the Government's offers to plea. *See* Def. Memo at 30.

The Court is aware of the applicable statutory penalties. It has reviewed each party's Guidelines calculations. It has carefully considered the nature of the offense at hand and harm done by *this* Defendant. It has also carefully considered the individual circumstances and characteristics of *this* Defendant. This is to say, this Court is confident the sentence it imposes today avoids unwarranted sentence disparities.

### d.  The Need to Provide Restitution

Lastly, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

As discussed *supra* at Section III(C), restitution in this instance is mandatory pursuant to 18 U.S.C. § 3663A. However, the Court reserves its right pursuant to 18 U.S.C. § 3664(d)(5) to

determine the amount owed as the Court still awaits responses from Defendant's victims and his victims' families.  PSR at ¶ 169.

## II.   Conclusion

A sentence of 40 years of incarceration, 5 years of supervised release with special conditions, restitution in an amount to be determined, forfeiture in the amount of $12,800, and a $300 mandatory special assessment is appropriate and comports with the dictates of § 3553.  This sentence is consistent with, and is sufficient but not greater than necessary to accomplish, the purposes of § 3553(a)(2).

The Court expressly adopts the factual findings of the Presentence Investigation Report and the addenda thereto, barring any errors contained therein, to the extent they are not inconsistent with this opinion.

**SO ORDERED.**

s/ WFK

HON. WILLIAM F. KUNTZ, II.
UNITED STATES DISTRICT JUDGE

Dated: February 9, 2023
           Brooklyn, New York

31